**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank Stearns GIESE,
Defendant-Appellant.**

No. 74–3407.

United States Court of Appeals,
Ninth Circuit.

May 2, 1979.

Rehearing Denied June 20, 1979.

Before, HUFSTEDLER and TRASK, Circuit Judges, and SWEIGERT,* District Judge.

TRASK, Circuit Judge:

Frank Stearns Giese appeals from his conviction for conspiracy to commit offenses against the United States. We affirm.

I

Early on the morning of January 2, 1973, a bomb exploded at a United States Navy recruiting center in Portland, Oregon. Two days later a United States Army recruiting center in that city was dynamited. These acts of terrorism were perpetrated in furtherance of a well-organized conspiracy, the objects of which were to dramatize the conspirators' opposition to America's participation in the Vietnam War and to disrupt military operations in the Portland area. The evidence showed that Giese played a leading role in the conspiracy.

Giese, a professor of French at Portland State University, met some of his co-conspirators through the Radical Education Project bookstore which he founded in the fall of 1971. He sent books to prisoners at the Oregon State Correctional Institution, and in January 1972 he and James Cronin,

Doron Weinberg, San Francisco, Cal., for defendant-appellant.

Sidney I. Lezak, U. S. Atty., Charles H. Turner, Asst. U. S. Atty., Portland, Or., for plaintiff-appellee.

As amended on denial of rehearing and rehearing en banc March 16, 1979.

* Honorable William T. Sweigert, Senior United States District Judge for the Northern District of California, sitting by designation.

who also worked at the bookstore, began leading group discussion sessions at the prison. The inmate participants included Lynn Meyer, Max Severin, and Chester Wallace. Meyer contacted Giese at the bookstore shortly after he was released from prison on furlough in November 1972. Giese introduced him to various people, one of whom was Leslie McKeel. She, in turn, introduced Meyer to Robert McSherry, James Akers, and several others. McKeel, McSherry, Akers, and Cronin jointly operated the Sundahl Painting Company. Meyer went to work for the company after receiving his parole on December 5, 1972. The Sundahl employees held business meetings and political discussions at Giese's bookstore. Akers and Severin, along with Cronin, worked there part-time.

McSherry and Meyer were the government's principal witnesses at trial. According to McSherry, the discussions at Giese's bookstore and elsewhere centered around the participants' vehement opposition to the Vietnam War. Eventually they grew tired of doing nothing but talk; they decided there was a need for direct action. On December 10, 1972, McSherry, Wallace, Severin, McKeel, Akers, Meyer, and two others held a five-hour meeting at Giese's farm. Giese greeted them but did not take part in the discussion. They agreed, as McSherry put it, "to do everything within [their] power to stop the war, to disrupt the war for at least as far as Portland went and as much as [they] possibly could." R.T. at 547. Believing violence was necessary to accomplish this end, they discussed bombing recruiting centers, robbing National Guard depots, and other crimes.

At this stage Giese had not yet agreed to finance the conspirators' operations. Needing money with which to buy weapons, they devised a plan to burglarize the residence of a wealthy Portland industrialist named Ira Keller. The attempted break-in took place on December 12, 1972, two days after the meeting at Giese's farm. Giese had become a full-fledged participant in the conspiracy by this time. According to McSherry, he drove several of his fellow conspirators to the Keller residence in a rented van. When

McSherry, Wallace, Severin, and Akers tried to enter the house, an alarm sounded and everyone fled. The following day Giese met with Akers, Severin, McKeel, Wallace, Cronin and two others at Cronin's apartment. They discussed the abortive Keller burglary, and Giese blamed their failure on a gross lack of planning.

The conspirators' next act of violence was arranged with greater care. While McSherry, Cronin, and Akers studied a book called the *Blaster's Handbook* to learn bombing techniques, Severin and McKeel obtained some dynamite. On January 2, 1973, Wallace, Cronin, Akers, Meyer and McSherry committed the Navy recruiting center bombing. There is no evidence that Giese actively participated in the January 2nd bombing. However, at a four-hour meeting held at his apartment on January 3, 1973, he expressed approval of what the bombers had done, although he criticized them for selecting a target in a low-income neighborhood. He suggested that terrorist activities directed against recruiting centers in downtown Portland or in the white suburbs would win more popular support. When he was informed that the next bombing target—an Army recruiting center—satisfied his criteria, Giese agreed to take part, and he helped to plan the operation. He also promised his confederates enough money to buy a vehicle and rent a hideout for storing explosives, ammunition, and stolen weapons.

McSherry and Meyer testified that early on the morning of January 4, 1973, Giese drove them and Akers to the Army recruiting center. Giese remained in his car while McSherry and Akers planted the explosives and Meyer stood watch. Meyer carried a pistol given him by Giese, and Giese was armed with a .38 caliber revolver. Their mission accomplished, Giese drove the bombers back to his apartment where they celebrated after learning that the bomb had exploded.

McSherry and Meyer testified that the conspirators used money given them by Giese to rent an apartment on Ankeny

Street in Portland which they used as a headquarters. Meyer said Giese also gave them firearms, including an M–1 carbine. On January 8, 1973, Giese met with McKeel, Severin, Wallace, Meyer, Akers, McSherry and Cronin at the Ankeny Street apartment. They discussed plans to rob a gun store. According to McSherry, Giese told them they were trying to do too much, too soon, and he urged them to split up and go underground for a while. When some of the others indicated their intention to go ahead with the gun store robbery, Giese refused to participate. He saw McSherry and the others again on January 13, 1973, outside the Ankeny Street apartment and at his farm. Giese was told that the conspirators would be arming themselves in the near future, and he again urged them to go underground. So far as the record shows, Giese did not take part in the gang's robbery of the Allison and Carey Gunworks in Portland on January 15, 1973, their robbery of a bank, their plot to rob a restaurant and blow up a sheriff's office, or their other crimes.

## II

On February 28, 1974, a federal grand jury for the District of Oregon returned a joint ten-count indictment charging Giese, Akers, Cronin, Meyer, and Wallace with a variety of offenses and listing McKeel, McSherry, Severin, and one other person as unindicted co-conspirators. Giese was named in six of the counts. Count IV charged him with misprision of a felony (the January 2, 1973, Navy recruiting center bombing). Counts V through VIII charged him with committing various offenses in connection with the January 4, 1973, Army recruiting center bombing, including possession of destructive devices, malicious destruction of government property, carrying firearms during the commission of a felony, and injury to government property worth more than $100. Paragraph one of Count X, which alleged a violation of 18 U.S.C. § 371,[1] said Giese, the other defendants, and the unindicted co-conspirators "did unlawfully, wilfully and knowingly conspire, combine, confederate, and agree together and with each other . . . to commit and cause to be committed certain offenses against the United States and other persons and institutions by means of acts of violence, terrorism and disruption, including the use of explosives to damage and destroy and to attempt to damage and destroy certain real and personal property, both public and private, including the property described in Counts II and VI of this Indictment which are realleged and incorporated herein by reference."[2] Count II alleged the malicious destruction of the Navy recruiting center and Count VI alleged the malicious destruction of the Army recruiting center.[3]

---

1. Title 18 U.S.C. § 371 provides in part:

 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. Paragraph two of Count X alleged that it was part of the conspiracy for the named defendants and the unindicted co-conspirators to carry firearms during the bombings. Paragraph three said it was part of the conspiracy for them to obtain dynamite and various component parts to be used to make destructive devices. Paragraph four charged that it was also part of the conspiracy for them to make and cause to be made destructive devices to be used in the bombings. Paragraph four further alleged the commission of thirteen overt acts in furtherance of the conspiracy. The overt acts included: holding various meetings, going to Ira Keller's residence, going to the Columbia River levee (where explosives were tested), going to the recruiting stations, possessing destructive devices, receiving a telephone call, and preparing a list of objectives.

3. Count II alleged:

 "That on or about January 2, 1973, at Portland, Oregon, in the District of Oregon, JAMES WESLEY AKERS, . . . JAMES ARTHUR CRONIN, LYNN BRUCE MEYER, . . . and CHESTER BENSON WALLACE, . . . defendants herein, by means of an explosive, did maliciously damage and destroy and attempt to damage and destroy a building and other personal property wholly possessed, used and leased by the General Services Administration, an agency

Prior to trial, Meyer entered a plea of guilty to the conspiracy charge and agreed to testify as a government witness. Conspiracy charges against Akers and Wallace were dismissed, as was the Count IV misprision charge against Giese. On October 16, 1974, the jury found Akers and Wallace guilty on Counts I through III and Counts V through VIII and found Cronin guilty on Counts I through III and Count X. The jury acquitted Giese on Counts V through VII but found him guilty on Count X (conspiracy). Because Giese did not file his appellate brief on time, this court severed his case from the appeals of the other defendants. On August 26, 1976, we affirmed in part and vacated in part the convictions of Akers, Cronin, and Wallace. Cronin's conviction for conspiracy was affirmed. *United States v. Akers,* 542 F.2d 770 (9th Cir. 1976).

In challenging his conviction for conspiracy, Giese raises six separate issues:

(1) Was Count X of the indictment legally sufficient?

(2) Did the district court err in denying Giese's motions for bills of particulars?

(3) Was the voir dire examination adequate?

(4) Did the court err in admitting certain evidence?

(5) Were the court's instructions to the jury erroneous?

(6) Did the government commit reversible acts of prosecutorial misconduct?

### III

Appellant Giese contends that his conviction must be reversed because the conspiracy charge against him was vague and overbroad, thereby depriving him of fair notice of the accusation against him and permitting the jury to return a guilty verdict based on conduct not violating federal law. He makes three arguments attacking the sufficiency of the conspiracy count.

First, he asserts that the indictment failed to specify adequately the offenses which were the object of the conspiracy. He says the indictment's incorporation of the federal offenses (the bombings) detailed in Counts II and VI did not exhaust the object offenses on which the jury could have based its conviction since the indictment also contained references to crimes against "other persons and institutions" and to the destruction of "public and private" property.

A well-drafted indictment conveys important information to a defendant. In *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962), the Supreme Court outlined the two standards by which the adequacy of an indictment is to be evaluated:

"These criteria are, first, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet," ' and secondly, ' " 'in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction'." [Citations omitted.]' "

An indictment charging a conspiracy under 18 U.S.C. § 371 satisfies these requirements if it alleges the three elements which are the gist of the offense: "the agreement, the unlawful object towards which the agreement is directed, and an overt act in furtherance of the conspiracy." *United States*

of the United States, and the Department of the Navy, a Department of the United States, all located at 4008 N.E. Union Avenue, Portland, Oregon, in the District of Oregon; in violation of Sections 844(f) and 2, Title 18, United States Code."
Count VI alleged:
"That on or about January 4, 1973, at Portland, Oregon, in the District of Oregon, . . . FRANK STEARNS GIESE, . . . and CHESTER BENSON WALLACE, . . .

defendants herein, by means of an explosive, did maliciously damage and destroy and attempt to damage and destroy a building and other personal property wholly possessed, used and leased by the General Services Administration, an agency of the United States, and the Department of the Army, a Department of the United States, all located at 5030 S.E. Foster Road, Portland, Oregon, in the District of Oregon; in violation of Sections 844(f) and 2, Title 18, United States Code."

*v. Charnay,* 537 F.2d 341, 350 (9th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 528, 50 L.Ed.2d 610 (1976). Because "the conspiracy is the gist of the crime" in such an indictment, "it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, or to state such object with the detail which would be required in an indictment for committing the substantive offense." *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 301–2, 71 L.Ed. 545 (1927) (citations omitted).

■ Applying these requirements to the present case, we reject appellant's argument that Count X was vague and overbroad. "[A]n indictment is not to be read in a technical manner, but [it] is to be construed according to common sense with an appreciation of existing realities." *United States v. Anderson,* 532 F.2d 1218, 1222 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). Such an interpretation of Count X persuades us that appellant's fears and complaints are illusory.

Considered as a whole, Count X adequately apprised Giese that the grand jury had found the two recruiting center bombings to be the primary object offenses of the conspiracy. The first paragraph of the count specifically referred to these offenses. The following three paragraphs stated that part of the conspiracy was for the defendants to carry firearms during the bombings and to construct the destructive devices used in the explosions.[4] In addition, almost all the overt acts referred to by the indictment pertained to these federal offenses.[5] After reading Count X, appellant could not possibly have been confused about what the government would attempt to prove at trial. As required by *Russell v. United States, supra,* 369 U.S. at 763, 82 S.Ct. 1038, he knew of the object offenses which he had to defend against.

Appellant urges that the broad language in Count X about offenses against "other

persons and institutions" and damage to "public and private" property embraced unspecified object offenses such as the attempted burglary of Keller's home and the robbery of the Allison and Carey Gunworks. This interpretation of the indictment is misguided. Since these acts are not federal offenses, it is unreasonable to assume that the indictment contained subtle, ambiguous references to crimes which could not properly be tried before a federal jury. Even if it did, however, this error was not fatal, for appellant was not on trial for conspiracy to commit non-federal offenses (specified or not in the indictment). He could not have been convicted on this basis, and he did not have to defend himself against these charges.

A more natural construction of these words is that they referred to the damage to private property located near the recruiting centers which resulted from the excess force of the explosions. The indictment did not need to refer to damage to adjoining property (and to the individuals who owned it), but any overbreadth or vagueness created thereby was not prejudicial. The jury was able to focus on the federal object offenses, as indicated by its verdict finding appellant guilty of "conspiracy to commit certain offenses against the United States." C.T. at 687.

Second, appellant contends that because the indictment described offenses which were non-federal, "[t]he likelihood that the jury improperly convicted [him], at least in part, on the theory that he conspired to commit offenses against persons or property referred to by the evidence, but not cognizable as federal crimes, is quite strong . . . .." He asserts that the trial court's failure to focus on the federal offenses in its instructions to the jury only increased the possibility of a conviction based on non-federal offenses.

■ This argument is not convincing. As we have established, Count X of the indictment focused on federal offenses: the

---

**4.** *See* note 2, *supra.*

**5.** *See* note 2, *supra.*

two bombings of the recruiting centers. Any reference to non-federal offenses were superfluous and harmless. Furthermore, even assuming that the indictment embraced non-federal offenses, the inclusion of a non-federal offense in a federal conspiracy indictment is permissible if the conspiracy also involves federal offenses. "A single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law." *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974).

■ A conviction for such a conspiracy is valid as long as the court's instructions inform the jury that the defendant's guilt must be based on his agreement to commit at least one of the conspiracy's objectives violating federal law. *See United States v. Gallishaw*, 428 F.2d 760, 763 (2d Cir. 1970). The trial court instructed the jury that the government was required to prove that appellant had conspired to commit federal offenses. The adequacy of this instruction (and an answer to appellant's assertion that he was convicted of conspiring to commit non-federal offenses) is shown by the jury's verdict, which found appellant guilty of "conspiracy to commit certain offenses against the United States." C.T. at 687.

Third, appellant objects to the section of the indictment which alleged that he conspired "to commit and cause to be committed certain offenses against the United States . . . ." After stating that "[t]here is no such federal offense as conspiracy to aid and abet the commission of a crime or conspiracy to cause the commission of a crime," he argues that the words "cause to be committed" impermissibly "allowed the jury to convict [him] of conspir-

acy on the basis that he merely aided and abetted criminal acts committed in furtherance of the conspiracy, rather than participating as a member of the conspiracy."

■ Appellant's interesting theory is based on his contention that it is not a federal offense to conspire "to cause to be committed" a crime against the United States. His contention is erroneous, however, as a simple reading of the statutes involved in the conspiracy charge demonstrates. Destruction of government property by means of an explosive is a violation of 18 U.S.C. § 844(f),[6] as alleged in Counts II and VI of the indictment. Conspiracy "to commit" any offense against the United States is a violation of 18 U.S.C. § 371; this violation was alleged in Count X. Since destruction of government property by explosives is an offense against the United States, clearly it is illegal to conspire "to commit" this act.

■■ Title 18 U.S.C. § 2(b) provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Combining this statute with 18 U.S.C. § 844(f), it follows that it is a federal offense to cause another person to destroy government property by means of an explosive. Because this act is an offense against the United States, it also follows that it is illegal under 18 U.S.C. § 371 to conspire "to cause to be committed" the destruction of government property by explosives. Thus, even if appellant had not participated directly in the January 4, 1973, bombing, the jury could have convicted him on Count X because of his participation in a conspiracy "to cause to be committed" this act of destruction.

---

**6.** Title 18 U.S.C. § 844(f) provides:

"Whoever maliciously damages, or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed, or used by, or leased to, the United States, any department or agency thereof, or any institution or organization receiving Federal financial assist-

ance shall be imprisoned for not more than ten years, or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years, or fined not more than $20,000, or both; and if death results shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title."

In *United States v. Lupino,* 480 F.2d 720, 724 (8th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 257, 38 L.Ed.2d 159 (1973), the defendant offered a similar argument by contending that conspiracy "to cause" a felon to commit the substantive offense of receiving a firearm (18 U.S.C.App. § 1202(a)(1)) is not a violation of 18 U.S.C. § 371. The court concluded that "[t]his ingenious argument, in the final analysis, constitutes a futile exercise in semantics." 480 F.2d at 724. We agree.

### IV

Prior to trial, appellant and his co-defendants made two motions for bills of particulars. The first motion contained over 100 separate requests, and referred to all ten counts of the indictment. The second motion contained fewer requests, each of which was related to Count X. Citing the "ambiguities and uncertainties" of Count X, appellant's second motion asked for a wide range of information, such as lists of conspiratorial acts performed by each person named in the indictment and of each overt act and object of the conspiracy. His first motion asked for even more specific information, such as how each of the 13 overt acts described in Count X contributed to the conspiracy and which oral statements made by the defendants created the conspiracy. Reiterating his theory advanced in section III, *supra,* that Count X of the indictment was vague and overbroad, he now argues that the court's denial of these motions was reversible error.

▪ Rule 7(f) of the Federal Rules of Criminal Procedure provides for a bill of particulars:

> "The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires."

The bill of particulars has three functions: "to inform the defendant of the nature of the charge against him with sufficient pre-cision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes." *United States v. Birmley,* 529 F.2d 103, 108 (6th Cir. 1976). *Accord, United States v. Andrino,* 501 F.2d 1373, 1378 (9th Cir. 1974); *Yeargain v. United States,* 314 F.2d 881, 882 (9th Cir. 1963). The denial of a motion for a bill of particulars is within the discretion of the district court; its decision will not be disturbed absent an abuse of this discretion. *United States v. Clay,* 476 F.2d 1211, 1215 (9th Cir. 1973).

▪ We find that the denial of the motions was not an abuse of discretion. As discussed in section III, *supra,* Count X of the indictment was neither vague nor overbroad. It apprised appellant of the federal offense with which he was charged and of the overt acts which allegedly contributed to his participation in the conspiracy. "To the extent that the indictment or information itself provides details of the alleged offense, a bill of particulars is, of course, unnecessary." 8 *Moore's Federal Practice* ¶ 7.06[1] at 7–31 n.1 (2d ed. 1978). Furthermore, the government provided appellant with a large volume of information, including physical evidence offered at trial, grand jury testimony, and memoranda which revealed the government's theory of the case. Full discovery also obviates the need for a bill of particulars. *United States v. Clay, supra,* 476 F.2d at 1215; 8 *Moore's Federal Practice* ¶ 7.06(1) at 7–33.

▪ The information available to appellant was actually more than he had a right to demand, for there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy. *United States v. Murray,* 527 F.2d 401, 411 (5th Cir. 1976); *United States v. Armocida,* 515 F.2d 49, 54 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Carroll,* 510 F.2d 507, 509 (2d Cir. 1975), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2633, 49

L.Ed.2d 378 (1976). Count X listed the 13 overt acts in furtherance of the conspiracy. Appellant's request for the "when, where, and how" of every act in furtherance of the conspiracy was equivalent to a request for complete discovery of the government's evidence, which is not a purpose of the bill of particulars. *United States v. Armocida, supra,* 515 F.2d at 54. "A defendant is not entitled to know all the *evidence* the government intends to produce, but only the *theory* of the government's case." *Yeargain v. United States, supra,* 314 F.2d at 882. From the indictment and the government evidence which he did receive, appellant learned enough of the charges against him to prepare for trial, to avoid surprise at trial, and to plead double jeopardy in the event of a new prosecution.

## V

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . .." An examination or "voir dire" of prospective jurors helps to ensure that the defendant is tried by an impartial jury. Rule 24(a) of the Federal Rules of Criminal Procedure provides that the court may decide whether it or the parties' counsel will conduct the examination.[7] If the court conducts the voir dire, it "shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper." Fed.R.Crim.P. 24(a).

We have held that "the scope of the voir dire examination and the procedures to be used are matters within the sound discretion of the trial judge, and will not be disturbed on appeal unless the procedures used or the questions propounded are so unreasonable or devoid of the constitutional purpose as to constitute an abuse of that discretion." *Haslam v. United States,* 431 F.2d 362, 364 (9th Cir.), *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1970). "It is not an abuse of discretion for the trial judge to insist upon conducting a voir dire examination, but if he does so, he must exercise a sound 'judicial' discretion in the acceptance or rejection of supplemental questions proposed by counsel . . .." *Silverthorne v. United States,* 400 F.2d 627, 638 (9th Cir. 1968).

### A. Juror Attitudes

Appellant does not contest these principles or the decision of the court to conduct the voir dire examination. Rather, he contends that as a man of unpopular political views who found himself on trial for conspiracy to destroy military recruiting centers, he was entitled to discover prospective jurors' attitudes toward law enforcement personnel, military personnel, the use of firearms, and the Vietnam War. He argues that the court's perfunctory exploration of these topics, coupled with its refusal to submit defense counsel's more probing ·questions to the jurors, was reversible error.

The amount of time a trial court must spend inquiring into prospective jurors' attitudes varies with each case. Most crimes are mundane, and require only a cursory voir dire examination. Crimes of bombing and terrorism, especially if· committed as a protest against governmental behavior, more easily arouse the prejudices of prospective jurors, however, and necessitate a more elaborate voir dire. Although appellant's activities occurred in 1972 and 1973, near the termination of the Vietnam War, they might have inflamed the passions of at least several prospective jurors, ren-

---

7. Fed.R.Crim.P. 24(a) provides:
 "The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

dering them incapable of performing fairly at his trial. Even in 1974, at the time of appellant's trial, many Americans opposed any form of protest against the War, and a still greater number opposed the equation of violence with political expression. Some laypersons might have carried these attitudes with them into a trial of a man accused of conspiring to bomb military recruiting centers. Therefore, it was essential for the trial judge in the present case to examine prospective jurors' attitudes toward appellant and the views he represented.

The court thoroughly questioned the first prospective juror, and elicited information about his views toward law enforcement personnel, the armed forces, the use of firearms, Vietnam War protests, and his exposure to pretrial publicity. This inquiry was detailed and comprehensive, and it focused on the areas about which appellant desired information. After hearing this juror's answers, appellant, the government, and the court knew with some certainty whether or not he was qualified to serve at the trial. The court's examination of several other jurors was also beyond reproach.[8] For some jurors, however, the court conducted a more limited inquiry, asking merely if a juror had any responses to questions that the court had asked other prospective jurors.[9]

■■■ In the interest of symmetry, a uniform examination of each juror might have been desirable. Our function is not to ascertain whether the voir dire met technical standards of perfection, however. We will not find an examination inadequate unless the district court abused its discretion by failing to ask questions capable of revealing the prejudices of the prospective jurors. In the present case, the court did not ask every juror specific questions about his or her attitudes toward law enforcement and military personnel, the use of firearms, and the Vietnam War. However, each juror was asked, at a minimum, to consider the more detailed questions directed at the previous jurors and to inform the court of any different responses which these queries elicited.

After observing the amount of time required for a full-scale examination of each juror, the district court had the authority to adopt a more compact mode of inquiry. *See Haslam v. United States, supra,* 431 F.2d at 364. In *United States v. Amaral,* 488 F.2d 1148, 1150 (9th Cir. 1973), we approved a voir dire in which the court asked the first prospective juror a question about racial prejudice and thereafter "reminded the prospective jurors that all questions asked of one juror were asked of all and that the voir dire process was a cumulative one designed to probe into the juror's state of mind to discover whether each could determine guilt or innocence based solely on the evidence presented at trial." The questions propounded by the district court in *United States v. Giese* succeeded in ferreting out jurors who were incapable of serving impartially. In response to the court's general question that incorporated the more specific questions asked of other jurors, several prospective jurors expressed strong feelings about law enforcement personnel and the Vietnam War.[10] These jurors did not serve on the panel which tried appellant.

At the close of the initial voir dire, the court permitted defense counsel to suggest additional questions to ask the jurors. Although the court refused to ask requested questions about President Ford's conditional amnesty plan and his pardon of former President Nixon, it did honor most of the other requests. This procedure gave defense counsel an opportunity to participate in the voir dire and to ensure that jurors with questionable qualifications were eliminated.

■■■ Appellant argues that the court erred in refusing to accept all his proposed questions, which he offered both before and during the examination. A district court

---

8. *E.g.,* R.T. at 292–302, 308–12.

9. *E.g.,* R.T. at 341–42, 366.

10. *E.g.,* R.T. at 350–52, 367–68.

has considerable discretion to accept or reject proposed questions, however, and as long as it conducts an adequate voir dire, its rejection of a defendant's specific questions is not error. *United States v. Heck,* 499 F.2d 778, 790 (9th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974); *United States v. Hamling,* 481 F.2d 307, 314 (9th Cir. 1973), *aff'd.* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The district court asked many of the questions suggested by appellant, but, to conserve time and avoid confusion, was justified in declining to ask the others. *United States v. Workman,* 454 F.2d 1124, 1128–29 (9th Cir.), *cert. denied,* 409 U.S. 857, 93 S.Ct. 138, 34 L.Ed.2d 102 (1972). Given the adequacy of the voir dire examination which it did conduct, we cannot say that the court erred in not using every question proposed by appellant:

> "The court closest to the situation can best evaluate the proper way to walk the difficult line between a vigorous voir dire to determine any possible bias and avoidance of creating bias by specific questions which add 'fuel to the flames' in suggesting the presence of controversial issues." *United States v. Polizzi,* 500 F.2d 856, 880 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

### B. *Pretrial Publicity*

Appellant also argues that the district court failed to safeguard his right to an impartial jury uninfluenced by prejudicial pretrial publicity. He contends that massive publicity surrounded his indictment, necessitating a detailed inquiry into the exposure of each prospective juror to media coverage. The trial court's cursory probe into this subject, he concludes, did not dispel the substantial possibility that he was tried by jurors who formed their opinions prior to trial.

Perhaps to the misfortune of everyone involved in the judicial process, no precise rule prescribes the type of voir dire examination which is necessary to protect against prejudicial pretrial publicity. The appropriate scope and detail of the voir dire depend on the level of pretrial publicity and the discretion of the district court. When "pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused." *Silverthorne v. United States, supra,* 400 F.2d at 637–38. The voir dire "must not simply call for the jurors' subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice." *United States v. Polizzi, supra,* 500 F.2d at 879. The district court should conduct a careful, individual examination of each prospective juror, preferably out of the presence of the other jurors. A general question directed to the entire group of prospective jurors is inadequate. *See id.* at 879–80; *Silverthorne v. United States, supra,* 400 F.2d at 638–40; ABA *Standards Relating to Fair Trial and Free Press* § 3.4(a) at 130 (Approved Draft, 1968).

In cases of less publicity, however, these procedures are not required. Several general questions addressed to the entire panel of jurors, followed by individual questioning of jurors who respond affirmatively to the initial inquiries, may be sufficient if it becomes clear that few jurors have any knowledge of the case. *See United States v. Liddy,* 166 U.S.App.D.C. 95, 103–104, 509 F.2d 428, 436–37 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975); *United States v. Polizzi, supra,* 500 F.2d at 879–80. Similarly, the court initially may ask several jurors specific questions about their exposure to pretrial publicity, and, once it is apparent that they know little or nothing about the case, may direct more general questions, incorporating all the questions asked previously to the remaining jurors. Since the district court confronts a difficult task in assessing the type of voir dire which is necessary, the responses of the first jurors queried can serve as an indication, at least as reliable as other subjective evaluations, of the amount of publicity the case has generated.

In the present case, the court asked approximately half the potential jurors, most of whom were among the first jurors questioned, about their exposure to pretrial publicity. Almost every juror had little or no prior knowledge of appellant's indictment, arrest, and pending trial.[11] Jurors who stated that they had formed opinions about the case did not serve on the trial jury.[12] The remaining jurors were asked more general questions about their ability to serve impartially. Again, however, jurors who expressed opinions about the case were excused.[13]

■ The district court did not abuse its discretion by the manner in which it disposed of the pretrial publicity question. "Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate." *United States v. Polizzi, supra,* 500 F.2d at 880. By its own observation of media coverage of appellant's case, the district court was able to determine the level of publicity surrounding the trial and the care required to screen out biased jurors. We are not in a position to assess more accurately how many headlines, editorials, and photographs the media devoted to appellant's activities, arrest, and trial. The absence of a significant number of jurors who were influenced by, or had even seen, coverage of appellant's case in newspapers and on radio and television reinforced the court's evaluation of this prosecution as one in which a highly intensive probe of each juror was unnecessary.

Only in a case involving extreme pretrial publicity, with demonstrated effects on the prospective jurors, have we held that a trial court's voir dire was inadequate. In *Silverthorne v. United States, supra,* 400 F.2d at 635, 639, all 65 veniremen admitted hearing about the case, and 30 percent of these panelists had formed an opinion about the defendant's guilt or innocence. We found that "under the peculiar and difficult facts of this case," the court had abused its discretion by conducting a cursory voir dire examination. *Id.* at 640. The factual pattern of *United States v. Giese* more closely resembles that of *United States v. Polizzi, supra,* however. In *Polizzi,* there had been some coverage of the defendant's trial, but the "trial judge's questions on pretrial publicity were limited to two questions addressed to the first prospective panel of jurors and later questions addressed to an individual prospective juror." *Id.* at 879–80 (footnotes omitted). Because the answers to these questions gave no indication of possible prejudice, we found the voir dire adequate. We make a comparable finding in the present case.

## VI

### A. *From the Movement Toward Revolution*

Giese claims the trial judge committed three separate errors in permitting the government to use a book entitled *From the Movement Toward Revolution* as evidence against him.[14] First, he argues that it was error to admit the book in the prosecution's case-in-chief for the purpose of showing the association between Giese and the other conspirators because its prejudicial effect outweighed its probative value. Second, he says the book's contents should never have been revealed to the jury because they were hearsay and irrelevant to the offense charged. Third, he argues that it was improper for the court to permit the prosecutor to ask Giese to read allegedly inflammatory passages from the book in front of the jury. Giese contends that in addition to

---

11. Approximately half of all veniremen asked specifically about their prior knowledge of the case stated that they had none. Almost all the jurors who knew about the case had only the vaguest understanding of the crimes committed and the political issues allegedly at stake. R.T. at 306–08, 310, 324, 333, 354, 358, 362, 379.

12. R.T. at 346–48.

13. *E.g.,* R.T. at 351–52, 367–68, 375–76.

14. Giese also contends that the court erred in permitting the prosecutors to mischaracterize the book in a prejudicial way during closing argument. *See* Part VIII and nn. 29 & 30 *infra.*

violating the rules of evidence, admission of *From the Movement Toward Revolution* infringed his First Amendment liberties, including freedom of expression and the right to receive information.

We reject Giese's arguments, but in so doing we wish to emphasize that we are not establishing a general rule that the government may use a person's reading habits, literary tastes, or political views as evidence against him in a criminal prosecution. In many cases such evidence would be clearly inadmissible. *See, e. g., United States v. McCrea,* 583 F.2d 1083 (9th Cir. 1978). Our decision upholding the admissibility of *From the Movement Toward Revolution* stems from the peculiar circumstances of this case and, reflecting our concern for the sensitive nature of First Amendment values, it rests on very narrow grounds. We hold that it was proper to introduce the book during the government's case-in-chief because it bore the fingerprints of Giese and three of his co-conspirators and thus tended to corroborate witnesses' testimony that the conspirators associated with each other. We further hold that it was proper to ask Giese to read extracts from the book on cross-examination because he opened the door to that line of inquiry

by introducing 18 books as evidence of his peaceable character during his own testimony on direct examination.[15]

At the outset we must clearly distinguish between the book as a physical object which bore certain fingerprints and the book as a work of literature which contained a particular message. During the government's case-in-chief not a single word was said by the prosecutors or by any government witness regarding the book's contents. *From the Movement Toward Revolution* was used solely for the limited and permissible purpose of proving association. Co-conspirator McSherry testified that the book—Government Exhibit C–49—belonged to co-conspirator Severin, R.T. at 672, and co-conspirator Meyer said he had seen it in the possession of various conspirators at apartments in Portland and Seattle. R.T. at 996. The prosecution and defense attorneys stipulated that FBI agent Frank Doyle would testify that he seized the book during the search of a San Jose, California apartment occupied by co-conspirators McKeel, Severin, and Wallace. Following the stipulation, Exhibit C–49 was received in evidence along with 26 other items which had been seized in San Jose. R.T. at 1290–91.[16] Ex-

**15.** In view of our holding that *From the Movement Toward Revolution* was admissible to prove association, to rebut Giese's character evidence, and to impeach Giese's credibility as a witness, we need not express any opinion regarding the government's argument that the book was also admissible to show the conspirators' purpose, motive, and intent.

**16.** The following colloquy took place at R.T. 1290–91:

"THE COURT: You have a stipulation of some sort?

MR. PAULSON [Giese's attorney]: Yes, sir.

MR. PAULSON: Basically, we have agreed if the agent were called he would say he searched and found certain exhibits and identified them. He will read off the list of exhibits.

THE COURT: And that you are not waiving your earlier objections?

MR. PAULSON: That is correct.

THE COURT: But stipulating as to this part of it?

MR. PAULSON: Yes, sir.

. . . . .

THE COURT: Which are the exhibits?

MR. TURNER [prosecutor]: Special Agent Doyle, pursuant to the search warrant searched Apartment Number 10 in San Jose and he found the following exhibits which he can identify which bear either his initials or some other identifying marks and they are—these are all C–21, 22, 23, 24, 25, 26, 27, 29, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 60—sorry, 59.

THE COURT: It will be received. . . . ."

When the trial judge said "It will be received," R.T. at 1291, he apparently meant "It" to include the group of exhibits as well as the stipulated testimony. The reporter's exhibit list states that *From the Movement Toward Revolution* was received in evidence at R.T. 1292. The reporter made a slight mistake: the list should say Exhibit C–49 was admitted at R.T. 1291. Throughout the rest of the trial, *From the Movement Toward Revolution* was consistently referred to by both sides as being "in evidence." *See, e. g.,* R.T. at 1673–74, 1765, 2077, 2078, 2133.

Giese's attorney's statement that he was not waiving his "earlier objections," R.T. at 1291, was a reference to a pretrial motion to suppress all items taken from the San Jose apart-

hibit C–49 was linked to individual conspirators when FBI fingerprint expert Richard Ranels testified that fingerprints found on the book matched those on exemplars furnished by Giese, Wallace, Severin, and McKeel. R.T. at 1510–14.[17]

On appeal Giese argues that the book had "virtually no probative value as evidence" of association, and what little value it did have was "substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Appellant's Brief at 44–45. No such objection was made at any point during the government's case-in-chief. Nor did Giese's attorney request a limiting or cautionary instruction when the book was received in evidence.[18] Consequently, we

---

ment. *See* R.T. at 116–26, C.T. at 406. The court held that Giese lacked standing to challenge the legality of the San Jose search and seizure, R.T. at 190, and denied the motion to suppress as to the defendant (Wallace) who did have standing. R.T. at 499–501. The court's ruling was not assigned as error on appeal, and therefore we express no opinion concerning it.

17. Three of Giese's fingerprints were found on page 146 of *From the Movement Toward Revolution;* three were on page 166; one was on page 167; and two were on page 168.

The dissenting opinion contains two somewhat confusing references to F.B.I. fingerprint expert Ranels' testimony concerning the possible age of the fingerprints found on Exhibit C–49. At one point the dissent says Ranels testified that "the recovered prints on 'Revolution' could have been up to seven years old." Elsewhere the dissent quotes Ranels as having "said that latent prints had been recovered that were seven years old." Judge Hufstedler's Opinion at 1203, 1207. These comments convey the erroneous impression that, from the standpoint of events which took place between late 1971 and early 1973, the fingerprint evidence was so stale and so remote as to be utterly devoid of any probative value. The dissenting opinion is misleading because it fails to note that when Ranels said he had found fingerprints that were "up to six and seven years old," he was not referring specifically to the prints on Exhibit C–49. Rather, he was simply recounting his general experience: at some time in the past he and his associates had examined documents that bore six or seven year-old fingerprints. Here is the colloquy between Ranels and Giese's lawyer on which the dissent's comments are based:

"MR. PAULSON: Can you tell us, sir, how long that fingerprint you said you found on page 166 had been present before you made your examination?

A. [RANELS]: No, sir, I cannot.

MR. PAULSON: Are there any limits? Could it have been there ten years or what?

A. [RANELS]: I can never recall having developed anything to my knowledge that was ten years old with this particular type of chemical. However, it could have been quite old.

MR. PAULSON: What do you mean by quite old?

A. [RANELS]: Under controlled processing we have developed prints of this type using this method that were up to six and seven years old."

R.T. at 1512.

The record clearly shows that the fingerprints on *From the Movement Toward Revolution,* which was copyrighted in 1971, were *at most* only three and one-half years old when Ranels testified at Giese's trial in October 1974. The prints were younger than that, of course, at the time Ranels and the other F.B.I. laboratory technicians processed them. Of greater relevance is the uncontradicted proof that the fingerprints were placed on the book during a *two-year* period, *i. e.,* between mid-March 1971 and mid-March 1973. The page Ranels was asked about (page 166) contains part of an article entitled "Open Letter to the Weather Underground." The article begins on page 164, at the bottom of which is this footnote: "Reprinted with permission from *The East Village Other,* Vol. 6, No. 13, February 23, 1971." The last item in the book is dated March 13, 1971. Thus it would have been impossible for the conspirators to have handled Exhibit C–49 prior to mid-March 1971. And since the book was seized from the conspirators' apartment in San Jose on March 22, 1973, R.T. at 1265–66, it would have been equally impossible for Giese and the others to have put their fingerprints on it after mid-March 1973. These dates are significant because the fact that Giese, Wallace, Severin, and McKeel passed *From the Movement Toward Revolution* among themselves sometime between mid-March 1971 and mid-March 1973 tended to corroborate prosecution witnesses' testimony that the conspirators associated with each other between late 1971 and early 1973.

18. Except for the Fourth Amendment objection discussed in note 16 *supra,* Giese's counsel made only one objection during the government's case-in-chief which was even remotely connected with *From the Movement Toward Revolution.* The objection did not challenge the book's probative value as circumstantial evidence of association, but merely alleged that the government had laid an inadequate foundation. Giese's attorney claimed a chart reproducing the fingerprints found on Exhibit C–49 was inadmissible because the prints may have

must apply a plain error standard of review to Giese's appellate argument that the book was inadmissible as proof of association.

We hold that the court below did not plainly err in permitting the prosecution to introduce *From the Movement Toward Revolution* for the purpose of showing association. Nothing about the book except its title was revealed to the jury during the prosecution's case-in-chief. It is true that book titles alone can sometimes have a tendency to prejudice a defendant, *United States v. McCrea, supra,* 583 F.2d at 1086, but in this case the exhibit's probative value clearly outweighed the title's slightly prejudicial effect. *McCrea* is readily distinguishable from the instant appeal because the books which were introduced by the prosecution in *McCrea* were totally lacking in probative value, either as works of literature containing a particular type of information or as physical objects linking the persons who read them. *McCrea* involved the prosecution of a single defendant who was charged with possession of unregistered firearms and destructive devices. Knowing possession was all the government had to prove; the defendant's intent was immaterial. *See United States v. Freed,* 401 U.S. 601, 607, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). One cannot logically infer *possession* of firearms and explosives (as opposed to knowledge of how to use them) from mere possession of books about guns, bombs, and related subjects. Thus the books' contents contributed nothing to the truth finding process. The *McCrea* opinion does not give any indication as to whether the books in question bore the defendant's

or anyone else's fingerprints. Even if they had, the books still would have been immaterial: since *McCrea,* unlike the case at bar, was not a conspiracy prosecution, whether the defendant did or did not associate with other persons was completely irrelevant.

■ In contrast to the books at issue in *McCrea, From the Movement Toward Revolution* had a great deal of probative value. As one of the three pieces of physical evidence [19] corroborating Meyer's and McSherry's testimony that Giese associated with the other defendants and the unindicted co-conspirators, thereby affording him an opportunity to enter into an agreement with them, Exhibit C–49 played an important role at trial. Of course, casual association, without more, is not proof of participation in a conspiracy, "but that is not to say that it [is] irrelevant to the issue. '[P]roof of * * * association or acquaintance, while not alone enough to establish the conspiracy, yet has sufficient bearing thereon to make it admissible.'" *Williamson v. United States,* 310 F.2d 192, 199 (9th Cir. 1962) *quoting Kanner v. United States,* 34 F.2d 863, 866 (7th Cir. 1929). *See also United States v. Armone,* 363 F.2d 385, 403–04 (2d Cir.), *cert. denied,* 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d 303 (1966) ("Since agreement is an element of conspiracy, evidence of association is relevant.")

■ Giese contends that even if evidence of association does have probative value under some circumstances, it had no value here because association was never in dispute: "Dr. Giese's acquaintance with

been put on the book before the beginning of the conspiracy as set forth in the indictment. The objection was properly overruled. Even if the fingerprints were placed on the book before the conspiracy jelled in December of 1972, the conspirators' association with each other prior to that time was relevant to the issue of whether they later formed an agreement. *Williamson v. United States,* 310 F.2d 192, 199 (9th Cir. 1962). Evidence of behavior and relationships antedating the period covered by the indictment is generally admissible as bearing on the existence of the conspiracy and on the significance of later behavior. *United States v. Partin,* 552 F.2d 621, 634 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189

(1977); *United States v. Crockett,* 514 F.2d 64, 72 (5th Cir. 1975). *Cf. United States v. Baumgarten,* 517 F.2d 1020, 1029 (8th Cir.), *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975) (Evidence concerning history and philosophy of Students for a Democratic Society and overall radical movement held relevant and admissible to show the association of defendants with one another prior to the date fixed in the indictment.)

19. The other two were address lists belonging to co-conspirators which contained Giese's name and telephone number. R.T. at 1178, 1292, 1316, 2045, 2049–50.

each of the alleged conspirators was conceded; his own direct testimony established that he had a relationship with each of them." Brief for Appellant at 45. In effect, Giese argues that the propriety of the government's proof of association, which was presented long before Giese took the stand, should be judged with the hindsight provided by his testimony on direct examination. This proposition is obviously without merit. The prosecution's evidence is not retroactively rendered inadmissible because it eventually turns out that the defendant chooses not to contest the point. The government had to prove agreement, and thus association, as part of its prima facie case. The fact of association was not stipulated to before trial, so until it heard Giese's testimony, the government had no way of knowing whether he would admit or deny his fraternization with the other conspirators. Association did not cease to be an issue until after the government had rested; therefore it would be unfair as well as inaccurate to say the prosecution lacked a justification for submitting evidence on the question in its case-in-chief.

Although the government's use of Exhibit C–49 in its case-in-chief was limited to proving association, the prosecution gained the right to cross-examine Giese on *From the Movement Toward Revolution's* contents when, on direct examination, Giese testified about the contents of a number of books and suggested they were indicative of his peaceable character.

Giese took the stand in his own behalf and denied supplying his alleged confederates with *From the Movement Toward Revolution* and the various explosives and firearms manuals which had been found in their possession. R.T. at 1673–76. Had he stopped his testimony about books at that point, he would not have opened any doors. But he did not stop. In response to his

counsel's questions, Giese produced a stack of 18 books and proceeded to describe them one by one. R.T. at 1676–82.[20] All 18 were introduced into evidence later in the trial and were available for the jury's inspection. R.T. at 1918. Some of the items were "representative samples" of the types of books Giese stocked in his bookstore, R.T. at 1676; others, including three books Giese had written, were his personal property and had been kept at his home rather than at the bookstore.[21] R.T. at 1678, 1734. None of the books had been seized by the government; none had been mentioned during the prosecution's case-in-chief; none had any connection with the offenses charged in the indictment. Likewise, the books were irrelevant to the issue of association: so far as the record shows, the other conspirators had never even seen the 18 books, let alone shared them with Giese.

Giese's direct examination testimony about the 18 books filled almost six pages of the reporter's transcript. R.T. at 1676–82. He prefaced his remarks with the statement that he had not "necessarily read all of these books," R.T. at 1676, but he left no doubt that he had read many of them. For instance, he offered a rather detailed exegesis of Frederick Engels' *Dialectics of Nature;* he discussed Camus's background; and he explained the theses of Pierre Jalle's *Pillage of the Third World* and Andre Gorz's *Strategy for Labor, A Radical Proposal.* He gave brief descriptions of the contents of *Soul On Ice* by Eldridge Cleaver, *Away With All Pests: An English Surgeon in People's China, 1954–1969* by Joshua Horn, *Capitalism and Underdevelopment in Latin America* by Andre Gunder Frank, *Soledad Brother* by George Jackson, *Black Elk Speaks* by John G. Neihardt, *Viet Nam in Photographs and Text* by Felix Greene, *Limits to Growth* (a report for the Club of

---

**20.** Giese's introduction of the 18 books during his own case-in-chief provides another ground for distinguishing his case from *United States v. McCrea, supra.* In *McCrea* the defendant did not offer books into evidence and suggest that they were indicative of his peaceable character. Hence the defendant in *McCrea,* unlike

Giese, did not open the door and invite the prosecution to use the contents of books for impeachment purposes.

**21.** Giese prefaced his comments about a couple of his own works by saying: "The next two we never sold at the bookstore." R.T. at 1678.

Rome), and *American Radicals: Some Problems and Personalities.* Giese also mentioned *Sisterhood Is Powerful, An Anthology of Writings from the Women's Liberation Movement* by Robin Morgan, *Readings in U.S. Imperialism* by K. T. Fann and Donald C. Hodges, and *Monopoly Capital, An Essay on the American Economic and Social Order* by Paul A. Baran and Paul M. Sweezy. The three works Giese had written were *Artus Desire, Priest and Pamphleteer of the Sixteenth Century, French Lyric Poetry,* and an article on Camus and Algeria which was published in the *Colorado Quarterly.*

Giese implied that the 18 books exemplified the kind of literature he sold, owned, or read, and that the literature, in turn, reflected his left-wing but non-revolutionary political views. His testimony about the 18 books, unlike his statements denying that he had sold the books introduced by the prosecution, was more than just an attempt to explain away government exhibits. The books were pieces in the overall mosaic of character evidence which Giese presented on direct examination. He prefaced his testimony about books with a detailed account of his involvement in various political causes, placing special emphasis on his participation in peaceful civil rights and anti-war movements. He described how he had grown increasingly concerned during the 1960s about social conditions and the direction which American foreign policy had taken. At first he had manifested this concern by taking part in marches and sit-ins. Then around 1969 he received a sizeable inheritance and decided that the best way to propagate his political views was to establish the Radical Education Project bookstore. R.T. at 1666–73. By juxtaposing an account of his participation in peaceful demonstrations with an explanation of his reasons for founding the bookstore and a description of the types of books he sold, owned, or read, Giese portrayed himself as a scholarly, humane, peace-loving political activist who possessed a decidedly non-violent character. He told the jurors to look at his track record. In the past, whenever he had wanted to bring about a change in government policy, he had picketed or tried to persuade others by disseminating ideas— the kinds of ideas contained in the 18 books. He suggested that, given this personal history, it would have been inconceivable for him to have turned to violence in order to make a political statement.[22]

*Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), remains the leading case on the use of character evidence by a defendant. There the Court, speaking through Mr. Justice Jackson, said:

> "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, *Greer v. United States*, 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpe-

---

22. In his closing argument, Giese's attorney emphasized that his client's supposedly pacific character was his principal defense:

> "Frank Giese, by participating in these peaceful demonstrations during the '60s, was following in the spiritual leadership, if you will, of Martin Luther King who believed in nonviolence as the way of achieving goals and who, again, had been a student of Mahatma Ghandi, another believer in nonviolence.
>
> "Frank Giese's spiritual heritage, insofar as working for change in our society goes, was along the line of peaceful demonstrations, nonviolent demonstrations. And I suggest to you that to say that a man who had worked for peace, to say that Frank Giese is out throwing bombs and bombing recruiting centers, is as illogical, if you will, as saying that Reverend Martin Luther King was a member of the Black Panther Party.
>
> "The fact of it is just the opposite. Dr. Giese is deducated [sic] to peaceful change, not violent change. His whole life reflected that."

R.T. at 2083–84.

trator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

"But this line of inquiry firmly denied to the State is opened to the defendant because character is relevant in resolving probabilities of guilt. He may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged.

. . . . .

"The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him."

335 U.S. at 475–76, 479, 69 S.Ct. at 218–220.

 Giese threw open the subject of his literary tastes and reading habits when he testified about the specific acts of selling, reading, and owning the 18 books. Unlike character witnesses, who must restrict their direct testimony to appraisals of the defendant's reputation,[23] a defendant-witness may cite specific instances of conduct as proof that he possesses a relevant character trait such as peaceableness. And "[o]nce a witness (especially a defendant-witness)

testifies as to any specific fact on direct testimony, the trial judge has broad discretion to admit extrinsic evidence tending to contradict the specific statement, even if such statement concerns a collateral matter in the case." *United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978). Professor McCormick's treatise states that where the defendant implicitly invites the jury to infer something about his character from his description of his background and conduct, he opens the door to cross-examination on all reasonably related matters:

"Ordinarily, when courts speak of an accused's putting his character in issue, it is assumed that the means by which he does so is introducing witnesses who testify to his good character in terms of reputation, or, more currently, opinion. Note should be taken, however, that by relating a personal history supportive of good character, a defendant may be opening the door to rebuttal evidence along the same line."

*McCormick's Handbook of the Law of Evidence* § 191, at 59 (2d ed. Supp. Cleary et al. 1978).[24]

Because character testimony alone may be enough to raise a reasonable doubt, defendants traditionally have been afforded considerable latitude when they testify about their personal histories. Sometimes they commit tactical blunders. We are cognizant of the limitations inherent in the use of literature as proof of character, and we do not applaud the strategy employed by Giese and his attorney. Nor do we bestow our imprimatur on the concept of trial by books. Nevertheless, the question before this court is not whether we think books are

---

**23.** Rule 405(a) of the Federal Rules of Evidence, which went into effect after Giese's trial, permits proof of character to be made by testimony in the form of an opinion, as well as by testimony as to reputation. Rule 404(a)(1) codifies the common law rule prohibiting the prosecution from introducing in its case-in-chief evidence of a trait of the accused's character "for the purpose of proving that he acted in conformity therewith on a particular occasion;" but where the accused himself offers such evidence, the prosecution may respond with evidence "to rebut the same."

**24.** *See, e. g., United States v. Bowe*, 360 F.2d 1, 14 (2d Cir.) *cert. denied*, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966) (In prosecution for conspiracy to blow up Statue of Liberty, where defendant on direct examination "placed his character in issue and attempted to portray himself as opposed to all forms of violence, it was proper on cross-examination to question him concerning the guns [found in his possession] and introduce them, for the purpose of rebutting, i. e., contradicting his self-portrait.")

a persuasive form of character evidence; the issue is whether the government had a right to respond once the defendant had, of his own volition, chosen that method of proving he was a peaceable, law-abiding individual.

 It is well-settled that the admissibility of character evidence "depend[s] on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject." *Michelson v. United States, supra,* 335 U.S. at 480, 69 S.Ct. at 221. Moreover, a trial judge has considerable discretion in determining what lines of cross-examination are reasonably related to the subject matter of the witness' direct testimony. *United States v. Higginbotham,* 539 F.2d 17, 24 (9th Cir. 1976); *United States v. Palmer,* 536 F.2d 1278, 1282 (9th Cir. 1976). The judge's ruling on the scope of proper cross-examination should not be interfered with on appeal unless he has plainly abused his discretion. *Lewis v. United States,* 373 F.2d 576, 578

(9th Cir.), *cert. denied,* 389 U.S. 880, 88 S.Ct. 116, 19 L.Ed.2d 173 (1967).

Justice would not have been served had the jurors been left with only the one-sided impressions created by Giese's 18 innocuous books. To show the opposite side of the coin, as it were, it was fair for the government to cross-examine Giese on other books he had sold, owned, or read. *From the Movement Toward Revolution* was such a book. It is true that Giese did not keep *From the Movement Toward Revolution* in stock at the bookstore, but he did not sell all of the 18 books there either. However, there is no doubt that Giese read and owned *From the Movement Toward Revolution.* In addition to handling and perhaps reading Severin's copy of the book, Giese possessed his own copy, portions of which he had read.[25] Given Giese's fairly extensive contacts with the book, we hold that the court below did not abuse its discretion in permitting the prosecution to inquire about *From the Movement Toward Revolution* on cross-examination.

 The court also correctly overruled Giese's objections that the book's contents were irrelevant and hearsay.[26] *From the*

**25.** On direct examination, Giese volunteered that he possessed his own copy of *From the Movement Toward Revolution.* Until Giese and his lawyer brought up the subject, nothing had been said about books belonging to Giese's personal library. The prosecution had referred only to Severin's copy of the book, Exhibit C-49, which bore Giese's fingerprints. *See* R.T. at 672, 996, 1290 1291, 1510 14 and pages 1185 1187 *supra.* Giese made the following statements on direct examination concerning his ownership of a copy of *From the Movement Toward Revolution* :

"Q [by Mr. Paulson, Giese's attorney] Did you ever carry or sell in the bookstore From the Movement Toward Revolution?

A [by Giese] I believe not.

Q Did you ever own a copy of that book yourself?

A I did.

Q Do you still own a copy of that book?

A I believe so.

Q Where did you purchase your copy of that book?

A I think it was J. K. Gill is the biggest book seller in Portland, Oregon. It's commercial." R.T. at 1674. On cross-examination, Giese acknowledged that he had read portions of his copy of *From the Movement Toward Revolu-*

tion. R.T. at 1765. Giese's copy was not introduced into evidence.

**26.** The objections were raised when the prosecutor asked Giese to read aloud portions of the book. We reproduce below, in its entirety, the government's cross-examination of Giese on *From the Movement Toward Revolution* :

"Q [by prosecutor Turner] Mr. Giese, I would like to show you what has been marked, entered into evidence as Government's Exhibit C–49. Do you recognize that book, sir?

A [by Giese] Well, I don't recognize the copy necessarily. I recognize the—

Q Not that particular copy but the book itself?

A Yes. I recognize the book.

Q Now, you testified that you have a copy of that book?

A I believe I still have a copy of the book.

Q Can you identify the title for the Court and the jury?

A From the Movement Toward Revolution.

Q And have you read the book?

A I have read snatches of it.

Q Would you like to, you heard Mr. Ranels testimony that some nine of your fingerprints appeared on various pages of this particular book?

*Movement Toward Revolution* was relevant for the dual rebuttal purposes of contradicting Giese's character evidence and impeaching his veracity as a witness. The passages he was asked to read were not hearsay because they were not introduced to prove the truth of the matter asserted (*i. e.,* that violent revolution is a desirable way to bring about social and political change.)

Giese claims the prosecutor "forced" him to read in front of the jury, an act he says unfairly prejudiced him. The record shows, however, that Giese was not forced to do anything. He did not protest when the assistant U. S. attorney asked him to read a particular passage. Neither his lawyer nor any other defense attorney objected to the act of reading as such. Giese was no more "forced" to read from the book than is a witness who is asked to read a prior inconsistent statement to the jury. If the witness demonstrates an unwillingness to do the reading—and no such unwillingness was shown here—the prosecutor can simply read the document to the jury himself.

■ The trial judge is accorded considerable discretion in deciding how evidence should be presented, just as he is given substantial discretion in determining what evidence should be received. In both instances, he must balance probative value on the one hand and degree of prejudice on

A Yes.

Q Did you ever give this book or one like it to any member—either of the people on trial or Mr. Cronin, wallace or Akers, Leslie McKeel, Max Severin, Robert McSherry, Lynn Bruce Meyer?

A I don't believe so.

Q Now, would you turn, Mr. Giese, with me to Roman numeral VIII at the beginning of the book, that is the introduction of the book, the preface?

A Okay. 8.

Q I would like to ask you to read—sorry, I mean 13.

A No. I believe it's—is it 13, it's XIII.

Q Thank you.

A It's XIII.

MR. PAULSON [Giese's lawyer]: Objection. It's hearsay and to my knowledge, he has not been charged with having read books but with acts in this case of—

THE COURT: Overruled.

(By Mr. Turner) Directing you attention, Mr. Giese, Roman numeral number 8?

A You mean Roman numeral 13?

A All right. Roman numeral 13. Can you read for us that paragraph 'We are all involved in the early stages'—do you see that?

A A paragraph beginning where?

A Right there—yes.

A Maybe I am on the wrong page—it is 8.

THE COURT: Mr. Turner, we will have the bailiff hand the book to you. It could be a different text or edition.

Q I don't think so, Mr. Giese, we can move on to something else.

Mr. Giese, would you look at Page 166, the last paragraph on the lower right-hand side, I have got a little check mark there?

A Yes.

Q Do you see that, sir?

A Yes, I do.

Q Could you read that particular paragraph for us and continue on?

A 'We are sorry to'—

MR. TURNER: Mr. Giese, there is an objection.

THE COURT: Wait a minute.

MR. PAULSON: May I have an objection?

THE COURT: You may have a continuing objection. Please proceed.

A You want to read it aloud? 'We are sorry to hear that the townhouse forever destroyed your belief that army [sic] struggle is the only real struggle. That places us in a unique position because, as Che stated, "armed struggle is the only solution for people who fight to free themselves" and we have lost dearly-loved comrades.'

Do you want me to go on?

Q Yes, sir.

A 'Also probably every experienced revolutionary has, but we realize that risks must be taken, some will die, others will replace them or us.'

Q Will you continue to the end of the paragraph.

A I am trying to make sense out of that sentence. All right. 'Others will replace them or us like people rapping about ending racism, colonialism, sexism and all of the other pigisms, exploitation and all that but these things can only be ended by revolution and revolution is in the final analysis armed struggle, revolution is violence, revolution is war, revolution is bloodshed. How long have different successful national liberation fronts fought before they have won large popular support.'

MR. TURNER: Thank you. Your Honor, subject to our previous discussion, I have no further questions."

R.T. at 1765–1768. The passage Giese read came from pages 166 and 167 of Severin's copy of *From the Movement Toward Revolution*; both pages bore Giese's fingerprints. *See* note 17 *supra.*

the other. *United States v. Robinson*, 560 F.2d 507, 515 (2d Cir. 1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), held that "the preferable rule" in reviewing a district court's decision on the question of unfair prejudice "is to uphold the trial judge's exercise of discretion unless he acts arbitrarily or irrationally." The reason for granting such broad discretion to the trial judge is that

> "he is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendants, jurors, and counsel, and their mannerisms and reactions. [Citation omitted.] He is therefore able, on the basis of personal observation, to evaluate the impressions made by witnesses, whereas we [appellate judges] must deal with the cold record."

*Id.* at 514.

*United States v. Doremus*, 414 F.2d 252 (6th Cir. 1969), sets forth a useful test for determining whether requiring a defendant to perform a given act on the witness stand unjustly prejudices him. Impermissible prejudice results when "the requested performance or demonstration would unjustly humiliate or degrade the defendant" or "such performance would be damaging to the defendant's image and irrelevant to the issue on trial." 414 F.2d at 254. Giese suffered no such injuries. Whereas some acts—such as a forced reenactment of an especially shocking crime—might degrade a defendant beyond repair, in this case Giese's attorney could easily have mitigated whatever damage resulted from the act of reading by simply asking his client on re-direct whether he agreed with what the book said. For reasons which are not apparent in the record, no such rehabilitative effort was made. But in any event, the act of reading probably did not significantly injure Giese's defense. In some ways, having Giese read the passage was actually *less* prejudicial than having the prosecutor or a witness do it. Giese was free to read in whatever tone he pleased. He could emphasize some words and skim over others. Had he read the excerpt, the prosecutor might have stressed its more violent parts, whereas Giese was able to read it in a monotone if

he wished. By reading the extract himself, Giese could and did express unfamiliarity with the ideas contained therein. After reading a few lines, he paused and said "I am trying to make sense out of that sentence." R.T. at 1768. *See* note 26 *supra.* In so doing, he suggested that he had not absorbed and adopted the revolutionary arguments set forth in the book. Allowing Giese to choose the tone in which the contents of *From the Movement Toward Revolution* were communicated to the jury could only have diminished, not increased, the book's prejudicial impact.

Even if the act of reading did hurt Giese's cause to some extent, the probative value of enabling the jury to observe his demeanor while he was being impeached outweighed the prejudicial effect. The "requested performance" was clearly relevant to an important issue in the case: Giese's credibility. It is axiomatic that jurors are entitled to see how the witness reacts when the cross-examiner catches him in a contradiction or exposes one of his falsehoods. *"The demeanor of the witness on the stand may always be considered by the jury in their estimation of his credibility."* IIIA *Wigmore On Evidence* § 946, at 783 (Chadbourn rev. 1974) (emphasis in original). Evidence is normally taken by means of *viva voce* testimony of witnesses rather than by written depositions because it is considered crucial for the judge and jury "to obtain the elusive and incommunicable evidence of a *witness' deportment while testifying."* V *Wigmore On Evidence* § 1395, at 153 (emphasis in original).

In light of these factors, we hold that the court below did not act arbitrarily or irrationally or otherwise abuse its discretion by failing to rule *sua sponte* that the act of having Giese read from the book unfairly prejudiced him.

Giese's First Amendment argument, which he did not assert by way of a timely objection or request for instructions at trial, is without merit. Having opened up the subject of his political and literary interests, Giese was not entitled to be selec-

tive in describing the contents of his books any more than the defendant in *United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), was entitled to be selective in describing what she did between the time she was kidnapped and her arrest. A defendant " 'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts'." *Brown v. United States*, 356 U.S. 148, 155, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958). *See also United States v. Lustig*, 555 F.2d 737, 750 (9th Cir.), *cert. denied*, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977). Just as a "defendant who takes the stand in his own behalf cannot then claim the [Fifth Amendment] privilege against cross-examination on matters reasonably related to the subject matter of his direct examination," *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971), one who raises the issue of the kind of books he sells, reads, or owns should not be able to invoke the First Amendment as a bar to cross-examination along the same lines.

B. *Co-conspirator Meyer's testimony concerning Giese's participation in political discussions and recommendation of books*

Without objection Meyer testified that during a discussion session with prison inmates Giese offered to send prisoners "free Communist or Socialist literature," R.T. at 951, and he discoursed on topics such as domestic revolution, radicalism, black liberation, Hitler, and the war in Vietnam. R.T. at 953. Without objection Meyer alluded to political discussions at the Radical Education Project bookstore and testified that Giese talked with him about "a pamphlet called 'Manual on Urban Warfare' by Carol Maragala," R.T. at 956, during a visit to the bookstore shortly after his furlough from prison in late November 1972. Over the defense attorneys' hearsay and relevancy objections, the court permitted Meyer to testify that during a meeting at the prison Giese "advocat[ed]" George Jackson's *Blood In My Eye*, a book which, according to Meyer, dealt with "urban warfare in American cities." R.T. at 953–54. Giese claims the trial judge erred in overruling the objections, and he further argues that the testimony about his participation in political discussions and his recommendation of certain books was irrelevant and infringed his First Amendment rights.

The hearsay question must be analyzed at two levels. At the first level, we have Giese's out-of-court statement recommending the book; at the second we have the author's out-of-court statements concerning urban warfare (as summarized by Meyer). Giese's comments about *Blood In My Eye* were not hearsay at all; they were admissions. *See* Fed.R.Evid. 801(d)(2)(A). There was no hearsay at the second level, either. Meyer's summary of the author's statements was not introduced to prove the truth of the matter asserted, *i. e.*, that urban warfare is taking place in American cities, but rather to show that Giese's recommendation of a book on that topic had an impact on one of his listeners (it whetted Meyer's interest in radical politics and literature, which was one of the factors that caused him to join the group at the bookstore). *See United States v. Mesarosh*, 223 F.2d 449, 454–55 (3d Cir. 1955), *rev'd on other grounds*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956) (witness' testimony that defendant read *History of the Communist Party of the Soviet Union* to class held not hearsay). *See also McCormick On Evidence* § 249 at 589–90 (2d ed. Cleary et al. 1972).

The trial judge's ruling on the irrelevancy objection was also correct. Evidence relating to Giese's statements about books and politics was relevant because it provided the jury with information about his relationship with many of the people who subsequently became his co-conspirators. Like the fingerprints on *From the Movement Toward Revolution*, Meyer's testimony shed light on the conspirators' association with each other. It also tended to show that Giese exercised a leadership role vis-a-vis the other conspirators. By conducting discussions on a topic of mutual interest—radical politics—and by furnishing or recommending

books on that subject, Giese attracted Meyer (and perhaps his fellow prisoners Severin and Wallace) to the group at the bookstore which eventually formed the conspiracy.

Meyer's testimony was not unfairly prejudicial. In fact, the government took steps to ensure that the jury did not draw improper inferences from evidence relating to books and political beliefs. In his summation, the assistant United States attorney reminded the jurors that Giese and his co-defendants were not on trial for reading or possessing certain types of literature or for subscribing to a particular political philosophy.[27] Our scrutiny of the record convinces us that the government used Meyer's testimony solely for permissible purposes and not to prove that Giese had a violent character or to induce the jury to punish him for reading and recommending radical literature. Accordingly we hold that Giese's First Amendment rights were not violated.

### C. *Post-Conspiracy Statements and Conduct*

The government's case against Giese relied in part upon the testimony of Leslie Rosen, a legal assistant to her husband, Michael Rosen, who represented one of the conspirators. Ms. Rosen testified that on or about September 7, 1973, subsequent to the conspiracy but prior to appellant's indictment, she, Giese, and Ross Brown, an attorney for unindicted co-conspirator Severin, met in Brown's office. She stated that Brown told Giese that Severin had informed him that Giese was "the leader and the planner of all of the illegal activities"; Brown also stated that he knew Giese was a participant in the attempted break-in at Keller's house and the driver of "the getaway car" used in the second bombing. Giese "just nodded and smiled" in response to these accusations. According to Rosen, Giese then stated that the Keller incident

"hadn't gone as smoothly as planned," and that "he had his passport ready but that he wasn't really concerned because it would be his first offense and even if he had to go to prison he felt that he could handle it." Out of Brown's presence, Giese told Rosen that "this [had] been an abortive mission from the beginning," and that the conspirators "hadn't followed his directions, that it had snowballed, that he had lost control and he specifically said that the people that were in prison for the robberies had really fouled up his plans and if they had done it the way he planned it, they wouldn't have been caught." R.T. at 1551–54.

Giese's verbal admissions to Rosen about his role in the conspiracy clearly were admissible, see Fed.R.Evid. 801(d)(2)(B), and he does not contend otherwise. He does argue, however, that the district court erred in admitting Brown's accusations, which he claims contained multiple hearsay. We disagree. Neither Brown's accusations nor Severin's alleged statements were offered to prove the truth of the matter asserted, that is, appellant's actual participation in the conspiracy. Rather, they were used merely to lay the foundation for a showing of Giese's failure to deny them. *See Anderson v. United States, supra*, 417 U.S. at 219–21, 94 S.Ct. 2253. Giese's ancillary argument that admission of Severin's out-of-court statements violated his right of confrontation is equally unpersuasive. Since the government did not offer the statements for their truth, Giese had no interest in cross-examining Severin. *Id.* at 220, 94 S.Ct. 2253.

Rule 801(d)(2)(B) of the Federal Rules of Evidence provides that a statement is not hearsay if the party against whom it is offered "has manifested his adoption or belief in its truth." In *United States v. Moore*, 522 F.2d 1068, 1075 (9th Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976), we stated:

not about the Vietnam War. The Government has not proceeded against people because at one point in time they may have been against the Vietnam War."
R.T. at 2025.

---

27. The prosecutor told the jury:
"This case is not about political repression; this is not a case where the Government is proceeding against people because of what they think or what they read. This case is

"The general rule concerning admissions by silence or acquiescence is well established. When an accusatory statement is made in the defendant's presence and hearing, and he understands and has an opportunity to deny it, the statement and his failure to deny are admissible against him."

An admission by silence should be introduced into evidence only after the district court has fulfilled certain responsibilities:

"Before admitting the proffered admission by silence, the trial judge must determine, as a preliminary question, whether the statement was such that under the circumstances an innocent defendant would normally be induced to respond." *Id.* at 1075.

The court should determine that sufficient facts have been introduced for the jury reasonably to conclude that the defendant heard, understood, and acceded to the statement. *Id.* at 1076. This should be only a preliminary or threshold determination, however, for the jury is primarily responsible for deciding "whether in the light of all the surrounding facts, the defendant actually heard, understood, and acquiesced in the statement." *Id.* at 1075.

Geise maintains that the admission of Rosen's statements as to his silence in the face of accusations did not satisfy these standards. He points to Brown's statement prior to his accusations that he did not want admissions or denials from Giese and to Brown's testimony at trial that appellant denied his guilt after the accusations. Giese contends that Brown's testimony contradicted Rosen's, making it uncertain whether he ever acknowledged guilt and compelling the district court to keep evidence of the alleged admission from the jury.

Brown's performance at the trial revealed him as a man of limited credibility, however. His statement about Giese's protestation of innocence conflicted with his grand jury testimony, in which he stated that "[a]t no time did Frank Giese deny any of the things which I said to him." R.T. at 1613. Throughout his testimony, Brown hesitated, confessed to a poor memory of the events in question, and gave ambiguous answers. Even if we can believe his statement that he told Giese not to respond to his accusations, the evidence was strong enough to support a reasonable inference that appellant admitted his guilt by nodding and smiling in response to Brown's charges.[28] In a non-custodial atmosphere prior to indictment, most people would deny accusations of having participated in federal offenses, even after being told that they did not have to respond. The district court acted properly in submitting this evidence to the jury.

■ Giese argues that, assuming the testimony regarding his admission by acquiescence was not inadmissible hearsay, it still should have been excluded as a violation of his right against self-incrimination. His reliance upon *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); and *Fowle v. United States*, 410 F.2d 48 (9th Cir. 1969), is misplaced, however, for those cases concerned the admissibility of a defendant's silence at the time of arrest and after he had received *Miranda* warnings. In that situation, a defendant may not be punished for invoking his right to remain silent; he is not expected to deny post-arrest accusations made by law enforcement officers. This logic does not apply to the non-custodial, preindictment meeting among Giese, Rosen, and Brown. Giese had every reason to deny his

---

28. We note that Brown also stated that appellant listened "impassively to my statements . . . appeared puzzled," and asked Brown what his purpose was in making the accusations. R.T. at 1598. Given Brown's limited credibility, the district court would have been justified in placing more reliance on Rosen's account of appellant's behavior. Moreover, even if Brown's version of the events was sincere, the district court or the jury could have read his testimony as indicating that appellant acquiesced in the accusations. It was for the jury to determine the weight to be given to this segment of Brown's testimony. *United States v. Moore, supra,* 522 F.2d at 1075.

guilt but none to admit it or to accede to Brown's charges. Brown and Rosen did not attempt to coerce an answer from Giese; he remained free to act as he pleased. Neither due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment in the face of accusations of criminal behavior.

## VII

### A. *Guilt by Association with the Conspirators*

Giese requested the district court to give the following instruction to the jury:

"Evidence that a defendant was in the company of, or associated with, one or more of the persons alleged or proved to have been members of a conspiracy is not in and of itself sufficient to prove that such defendant was a member of the alleged conspiracy." C.T. at 754.

He argues that the court committed reversible error in failing to give this instruction.

We find that the court's instructions sufficiently warned the jurors that they could not convict on the basis of appellant's mere, innocent association with the conspirators. The court informed the jury that: (1) "a defendant is never to be convicted on mere suspicion or conjecture," R.T. at 2187; (2) the government must prove that "a defendant charged with conspiracy was aware of the common purpose of the conspiracy, had the intent to advance it and was a willful and knowing participant," R.T. at 2217; and (3) as to substantive crimes, "mere presence at the scene of a particular crime charged and knowledge that the crime is being committed, are not sufficient to establish that a particular defendant aided and abetted the crime unless you find, beyond a reasonable doubt, that the defendant knowingly participated, as I previously defined that term, and was not merely a knowing spectator." R.T. at 2231.

### B. *Knowledge of the Conspiracy*

Giese also disputes the court's decision not to use the exact words contained in the following requested instruction:

"[M]ere knowledge, acquiescence or approval of the act, without cooperation or agreement to cooperate, is not enough to constitute a person a party to a conspiracy. There must be an intentional participation in the scheme with a view to furthering the common design and purpose." C.T. at 758.

The court did, however, convey to the jury the substance of appellant's requested instruction. "A court is not bound to accept the language of a requested instruction proffered by counsel nor to give a proposed requested instruction if the court gives it in substance." *Amsler v. United States,* 381 F.2d 37, 52 (9th Cir. 1967).

### C. *Acts and Declarations of Co-Conspirators*

With respect to Giese's membership in the conspiracy, the court instructed the jury, *inter alia:*

"In determining whether or not a particular defendant was a member of the conspiracy, you may consider the evidence of his conduct and actions, together with his own statements and declarations. You may also consider and weigh the acts and declarations of other co-conspirators which were made during the course of the conspiracy and in furtherance of it, as bearing on the question of a defendant's membership in the conspiracy." R.T. at 2216.

Giese's objection to this instruction is misplaced. Once the trial court decides that independent evidence, *i. e.,* proof other than co-conspirators' acts and declarations, would support a finding connecting the defendant to the conspiracy, "it is the jury's function to determine whether the evidence, including the [co-conspirators'] declarations, is credible and convincing beyond a reasonable doubt." *Carbo v. United States,* 314 F.2d 718, 737 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964). Assuming that the court made the initial assessment of whether a prima facie case existed against appellant, it prop-

erly instructed the jury that it could rely upon this well-established exception to the rule against the admission of hearsay evidence and consider the acts and declarations of the co-conspirators.

 Giese offers the related objection that the district court erred in not making an explicit finding of a prima facie case of his membership in the conspiracy. We have not required the trial court to make such an explicit finding, however. *See United States v. Calaway,* 524 F.2d 609 (9th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976); *United States v. Smith,* 519 F.2d 516 (9th Cir. 1975). Submission of the case to the jury, with instructions that it can consider co-conspirators' statements, is an indication that the court has found independent evidence establishing a prima facie case. We will not find error unless the evidence is insufficient. Here, a good deal of independent evidence connected appellant to the conspiracy. *See* section I, *supra.*

### D. *Constitutionally Protected Speech, Association and Assembly*

Giese contends that the inherent nature of the case, aggravated by the government's introduction of evidence of his political beliefs and activities, made the conspiracy "bifarious," that is, one involving unlawful actions and constitutionally protected activities. Under these circumstances, he asserts, the court was required to give the jury special instructions cautioning it not to convict on the basis of First Amendment activities. Because the record does not indicate that the jury did not base its verdict on conduct safeguarded by the Constitution, he concludes, his conviction must be vacated.

 We agree with Giese that it was necessary to ensure that the jury understood the grounds upon which it could return a conviction. However, we find that the court's instructions sufficiently warned the jury that it could not convict appellant on the basis of legal conduct, such as peaceful opposition to the Vietnam War, protected by the First Amendment.

The court instructed the jury that four material elements were required to find Giese guilty of participating in the conspiracy: (1) that the conspiracy alleged in Count X actually existed; (2) that Giese "willfully and knowingly became [a member] of the conspiracy with intent to further its objectives"; (3) that "the conspiracy formed by at least two or more of these persons was for the purpose alleged, namely, to commit and cause to be committed, certain offenses against the United States and other persons and institutions by means of or acts of violence, terrorism and destruction, including the use of explosives to damage and destroy certain real and personal property, including the property described in Counts 2 and 6 of this indictment"; and (4) that during the conspiracy "one of the members of that conspiracy willfully and knowingly committed at least one or more of the overt acts described in Count 10 of the indictment, in furtherance of and for the purpose of achieving the objectives of the alleged conspiracy." R.T. at 2213–14.

Although these instructions did not explicitly prohibit the jury's consideration of First Amendment activities, they did, by their very terms and logic, negate the relevance to the verdict of Giese's protected speech, association, and assembly. The jury could have convicted Giese only after finding that he "willfully and knowingly" joined a conspiracy formed "to commit and cause to be committed, certain offenses against the United States and other persons and institutions by means of or acts of violence, terrorism and destruction." Nothing could be clearer, or less threatening to First Amendment values. After hearing these instructions, no reasonable juror could have found that Giese joined the conspiracy solely by expressing opposition to the Vietnam War. A more direct and purposeful manifestation of intent was required to find that he joined the conspiracy "willfully and knowingly."

### VIII

Giese contends that during its closing arguments to the jury, the prosecution com-

mitted blatant acts of misconduct. The trial transcript reveals that the prosecution did, in fact, make improper statements on several occasions, although these errors were not as egregious or shocking as appellant would have us believe. First, the prosecution offered personal characterizations of Giese, calling him "sick," "a wolf in sheep's clothing," and "a very dangerous individual," R.T. at 2175, 2180; it also made statements which appeared to ask the jury to place faith in the government's credibility. Second, the prosecution suggested that non-testifying codefendant Wallace's confession, which the court earlier had ruled was inadmissible against Giese, was "one of the more significant pieces of corroboration" of the testimony of · McSherry and Meyer against Giese. R.T. at 2043. Third, the prosecution improperly commented on Giese's failure to produce certain evidence, such as an exculpatory account of the events in question from unindicted co-conspirator Severin, which, it claimed, an innocent man would have presented. Fourth, the prosecution used some slightly overblown rhetoric in describing *From the Movement Toward Revolution.*[29]

 A criminal trial can function fairly and effectively only if it is aided by a United States attorney who accepts his dual responsibilities:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to

refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

In the present case, the United States attorneys made statements, perhaps inadvertently and without malice, which violated these principles.

 Not every instance of prosecutorial misconduct or error requires reversal, however. Giese neither objected to the prosecution's statements nor asked for corrective instructions; he challenges the prosecution's conduct for the first time on appeal. "It is well established that in the absence of an objection or request for a corrective instruction, there must be plain error to afford a basis for reversal." *United States v. Perez,* 491 F.2d 167, 173 (9th Cir.), *cert. denied,* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). A plain error is a highly prejudicial error affecting substantial rights. *Id.* at 174; Fed.R.Crim.P. 52(b); 8B *Moore's Federal Practice* ¶ 52.02[2] at 52–3 to 52–6. We reverse a criminal conviction on the basis of plain error "in the very exceptional situation only, situations wherein it appears to be necessary in order to prevent miscarriage of justice or to preserve the integrity and reputation of the judicial process." *Marshall v. United States,* 409 F.2d 925, 927 (9th Cir. 1969). When the evidence against a defendant is so strong that the absence of prosecutorial misconduct would not have changed the jury's verdict, plain error seldom will be found. *See United States v. Greenbank,* 491 F.2d 184, 188–89 (9th Cir.), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974); *Corley v. United States,* 124 U.S. App.D.C. 351, 352, 365 F.2d 884, 885 (1966).

 We conclude that the prosecution's conduct did not amount to plain error. The case against Giese was strong. *See* section I, *supra.* A large amount of evidence, unaffected by anything the prosecution did

---

**29.** One prosecutor described *From the Movement Toward Revolution* as "an architectural manual, basically, of urban warfare," R.T. at 2050, and the other said "[t]hroughout that book are references to the very thing that these people did." R.T. at 2172.

during its final arguments, connected Giese to the conspiracy. Absent the prosecution's improper remarks, the jury still would have found him guilty. In other decisions, we have found that personal expressions of guilt and comments on a defendant's failure to produce evidence were not serious enough to require reversal. *United States v. Fong,* 475 F.2d 189, 190 (9th Cir.), *cert. denied,* 412 U.S. 942, 93 S.Ct. 2785, 37 L.Ed.2d 402 (1973); *United States v. Zumpano,* 436 F.2d 535, 539 (9th Cir. 1970). As to the prosecution's use of Wallace's confession, this error did not affect substantial rights. The confession served only as corroborative evidence against Giese. Without it, the case against him remained convincing. Likewise, although we wish the prosecutors had exercised greater restraint in characterizing *From the Movement Toward Revolution,* we find nothing in their remarks about the book which compels reversal.[30]

AFFIRMED.

SWEIGERT, District Judge,* concurring:

I concur in Judge Trask's affirmance of appellant's conviction and judgment after his painstaking analysis of the record, including, of course, his conclusions concerning the use of the book (Government Ex. C–49) during the trial.

On this particular issue I merely summarize those points made by Judge Trask which have led me to this concurrence.

*The Introduction of the Book Into Evidence*

1. The book in question was introduced into evidence during the government's case in chief, not only without objection or any limitations motion, but, indeed, as part of a stipulation concerning the admission of this and 26 other items.

2. The contents of the book were never referred to by the government during its case in chief nor was the book, itself, mentioned except in connection with testimony that the book bore the fingerprints of defendant Giese and other alleged conspirators.

3. Under these circumstances the "plain error" standard is applicable so far as the introduction of the book is concerned.

4. There was no plain error on the part of the trial judge in allowing the book to go into evidence since the book, coupled with the fingerprint evidence, was relevant on the issue of conspiratorial association—even though the book might be circumstantial and cumulative on that issue.

5. The mere fact of the title of the book was not, up to this point, sufficient to require the trial judge to substitute his judgment concerning evidence for that of the

---

**30.** Since the book was in evidence, the government attorneys were entitled to comment on it to a certain extent. However, they should have confined their remarks to stressing the sharp contrast between the kinds of books Giese said he read and the kinds he actually read, thereby reminding the jurors that *From the Movement Toward Revolution* had been used to contradict Giese's character evidence and to impeach his credibility as a witness. Having considered all of the circumstances, we conclude that the prosecutors' failure to so limit their remarks was not so improper and damaging as to compel reversal. We note that although Giese's attorney had registered his "continuing objection" to the admissibility of the book's contents, *see* note 25 *supra,* he did not voice an objection or request a curative instruction in response to the government's comments in closing argument. We further note that the defense attorneys made extensive use of the book in their own summations. Co-defendant

Cronin's counsel sarcastically characterized *From the Movement Toward Revolution* as a "song book." R.T. at 2133. Co-defendant Wallace's lawyer told the jury that the book was one of the weakest links in the government's case. R.T. at 2145. The defense attorneys repeatedly urged the jurors to peruse various parts of the book, R.T. at 2078, 2079, 2145, 2151, and the lawyers for Giese and Cronin even went so far as to read extracts from pages of *From the Movement Toward Revolution* on which no conspirator's fingerprints were found. R.T. at 2078–79, 2133. The defense attorneys' behavior at trial belies Giese's appellate argument that the prosecutors' references to *From the Movement Toward Revolution* in summation so inflamed the jury as to deprive him of a fair adjudication of guilt or innocence.

* Sitting by designation.

government—especially absent any alerting objection from defendant.

*The Use of the Book by the Government on Cross-Examination of the Defendant*

6. This must be considered in the light of the fact that by this time an important change had occurred in the posture of the trial: Defendant, taking the stand in his own behalf, did not merely deny supplying the book to the co-conspirators, but went on to volunteer, under questioning by his counsel, the production of 18 other books (none of them previously mentioned in the trial), as exemplification of the kind of books he owned, sold and read—all obviously for the purpose of stressing his commitments to peaceful, rather than violent, social or political action.

7. In legal effect this testimony was evidence of specific acts in his personal history supportive of his good character with respect to the character traits involved in the crime charged against him. See, *United States v. Benedetto,* 571 F.2d 1246, 1250 (2d Cir. 1978); also *McCormick's Handbook on the Law of Evidence,* § 191 p. 59 (2d ed. Supp. Cleary, et al. 1978).

8. The government at this point became entitled to cross-examine defendant in order to refute his claim of good character traits by confronting him with other kinds of books, including the book (Ex. C–49) of which, admittedly, Giese had a copy and had read from it.

*The Reading from the Book by the Defendant during his Cross-Examination*

9. Although defendant objected (for the first time) to use of the contents of the book on cross-examination, the objection, however, was merely on the grounds of hearsay and relevancy. It does not appear that the objection was directed to the manner in which the contents of the book already in evidence were to be elicited, i. e., whether it was to be read by the prosecutor or by the witness upon request.

10. There is nothing wrong with the fairly common practice of letting a witness, himself, read from documents already in evidence—especially absent specific alerting objections. The trial judge was not required at this point to inject himself into the procedure.

11. The record here is such that an affirmance could not be interpreted as contrary to or inconsistent with the language of *United States v. McCrea,* 583 F.2d 1083 (9th Cir. 1978). Further, just as in *McCrea,* the conviction here is so amply supported by other evidence that no prejudice could result from this court's refusal to unreasonably and unrealistically stretch the "plain error" rule.

HUFSTEDLER, Circuit Judge, dissenting:

Dr. Giese's conviction for conspiracy must be reversed because it was obtained by patently inadmissible evidence of the contents of the book "From the Movement Toward Revolution", which the prosecutor forced Giese to read to the jury after defense counsel's objection to the admission of the book had been overruled. The prosecutor used the contents of the book to convince the jury that the ideas expressed in the book were Giese's own and that he acted on those ideas to form a conspiracy to blow up recruiting centers. Giese was thus convicted of conspiracy by book association in egregious violation of the guarantees of the First Amendment.

The majority holds that Giese cannot complain about the errors because (1) he failed to preserve the point during the Government's case-in-chief, (2) he invited the errors by testifying to his peaceable character, thus opening the door to impeaching him by proving that he read a book advocating revolution, (3) he invited the errors by introducing samples of books that he carried in his bookstore, thus opening the door to evidence that he read this particular book, and (4) no plain error occurred either in admitting the book's contents or in asking the jury to convict Giese for conspiracy based on the ideas expressed in the book.

The record flatly contradicts the majority's waiver and invited error theories. The Government did not use the contents of the book for impeachment, and it never attempted to defend the admission of the book on that ground. Even if Giese's lawyer had not adequately protected the trial record, plain error requires reversal because neither the use of the book to prove the substantive elements of the offenses with which Giese was charged nor the use of the book for impeachment was permissible under the First Amendment.

The majority's opinion is irreconcilable with this court's decision in *United States v. McCrea* (9th Cir. 1978) 583 F.2d 1083.

Finally, the prosecutor's argument to the jury contained numerous instances of prosecutorial misconduct which, under the circumstances of this case, would independently require reversal.

### I

The Government's case against Giese rested almost entirely upon the credibility of the testimony of McSherry and Meyer. Both men had unsavory records and, as the Government correctly anticipated, both witnesses were seriously impeached during the trial. McSherry, a principal figure in the conspiracy, had pleaded guilty to the bombing and bank robbery charges, and he agreed to testify against Giese in exchange for a sentencing recommendation. Meyer had a criminal record and a long history of mental illness and emotional instability. The Government did not succeed in persuading the jury that Giese was involved in the substantive offenses, and the jury acquitted him of those charges. In an effort to bolster the credibility of McSherry and Meyer, the Government, from the outset of the trial, relied upon the contents of books and pamphlets, found in the possession of some of the alleged co-conspirators, to convince the jury that the conspiracy and the substantive offenses were planned by the defendants in accordance with the ideas presented in the books and pamphlets.

To understand the evidentiary and constitutional problems presented in this case, it is necessary to describe in more than usual detail the course of the trial and to quote sometimes extensively from the record.

During pretrial proceedings, the Government produced many different books and pamphlets in response to a court order to produce for defense inspection "all physical evidence the Government expects to offer at the time of trial." Among the items produced were a number of books and pamphlets seized during the search of an apartment occupied by McKeel, Severin, and Wallace. The 27 items seized during that search were all marked as "C–" series exhibits. One of the items was "From The Movement Toward Revolution" (hereafter "Revolution"). The book was marked Government's Exhibit C–49, and a chart of latent fingerprints recovered from C–49 was marked C–49–A.[1]

In his opening statement to the jury, the prosecutor explained how the Government intended to prove its case. He told the jury that a large quantity of evidence had been discovered in the searches of the various residences of the defendants. That evidence included "guns, ammunition and blasting caps . . . recovered in the residence lived in by or used by Mr. Akers in Seattle, Washington. It includes books, literature and paraphernalia or pamphlets which relate to the use and manufacture of explosives and explosive devices and the use and acquisition of firearms." He said that the Government intended to rely upon fingerprints found on some of these books and upon the contents of others. He described one of the books entitled "The Blaster's Handbook" as one of the "more significant pieces of evidence in this case. It is the ABC's of bombing, the how-to-do it, how to

---

1. In addition to "Revolution," the following books and pamphlets were seized: "Ants in the Home and Garden," "Special Forces Handbook," "Firearms and Self-Defense Manual," "Army Technical Manual," "Tactical Trends Manual," "Road to Revolution," "Humanity, Freedom and Peace," "The Paper Trip," "The Anarchist's Cookbook," and "Protect Yourself from Investigation."

use explosive devices, that book was examined by a laboratory expert of the FBI from Washington, D. C., and interspersed with the pages of that book were the fingerprints of the defendants Wallace, Cronin and Akers."

An integral part of the Government's case-in-chief was the introduction of books and pamphlets. Although many of the books were identified only by title, the contents of some of them were discussed. The Government's lead-off witness was McSherry, who was asked to identify a series of books and pamphlets and to describe generally the nature of their subject matter. McSherry identified "Special Forces Handbook," which he said dealt with "explosive devices, mines, and different kinds of explosives and how to detonate them." After identifying several other books, the prosecutor handed "Revolution" to him and said: "What about C–49?" McSherry replied: "C–49 belonged to Max Severin, and it's entitled 'From The Movement Toward Revolution,' and it was written by an acquaintance of Severin's, Bruce Franklin." He concluded his round of identification testimony with "The Anarchist's Cookbook," which he said was "part of the group's library."

The Government pursued its book theme with the presentation of Meyer's testimony. Meyer first met Giese when Meyer was an inmate of the Oregon State Correctional Institute. Giese volunteered his services for lectures and for conducting discussion groups in the institute. Meyer testified that Giese volunteered to send prisoners liberal and radical literature. He said that Giese conducted a discussion group at the prison and that he "advocate[d] George Jackson's book, Blood in My Eye," which Meyer said, over objection, dealt with "urban warfare in American cities." Meyer testified that he requested and that he later received literature from the Prison Support Group, an organization that was sponsored by the R.E.P. Bookstore, owned by Giese. When the prosecutor showed him a copy of "Revolution," Meyer identified the book as one of those that he had seen in various houses occupied by the alleged conspirators.

Although the prosecuting attorney emphasized the contents of such books as "The Blaster's Handbook," and "The Anarchist's Cookbook," nothing was said about the contents of "Revolution" during the Government's case-in-chief. As Judge Trask correctly observes, "Revolution" was used as a "physical object," for the purpose of introducing fingerprints found on the book. The Government was unable to show that Giese had any connection with the other books it had offered in evidence.

As part of its case-in-chief, the Government called Mr. Ranels, an FBI identification specialist from Washington, D.C. He testified that he had recovered latent fingerprints on several of the books and pamphlets that the Government had introduced. Latent fingerprints were found on "The Blaster's Handbook," "Socialism and Man," "Socialist Revolution," and others. Many unidentified fingerprints were found on these books, but he was able to identify fingerprints of Cronin, Akers, McKeel, Wallace, and Severin on some of them. Giese's fingerprints were discovered on "Revolution."

Of the many prints found on "Revolution," Mr. Ranels was able to identify the fingerprints of Giese, McKeel, Wallace, and Severin, appearing on pages 166, 167, and 168. After ascertaining from Mr. Ranels, by examination in aid of an objection, that the recovered prints on "Revolution" could have been up to seven years old, Giese's lawyer objected to the receipt of the fingerprint evidence on the ground that no proper foundation had been laid and on the further ground that the evidence was irrelevant to any issue in the case. The court overruled the objections.

As part of its case-in-chief, the Government also produced testimony from Meyer that Giese recommended radical books advocating violence during his lectures at the Oregon Correctional Institute. Both McSherry and Meyer testified to Giese's association with the alleged co-conspirators, not only in the Institute, but also in his R.E.P. Bookstore. A number of ex-con-

victs, including some of the co-conspirators in this case, had worked as volunteers in the bookstore and some of them had also worked in a paint company formed by the ex-convicts for their support.

When Giese took the stand in his own behalf, he described his educational, personal, and political background. He told the jury about his participation in civil rights demonstrations and demonstrations against the Vietnam war. In an effort to rebut implications that his bookstore carried how-to-do it books and pamphlets about manufacturing bombs and explosives, his lawyer asked him: "Doctor, we have in the exhibits . . . a number of books and pamphlets introduced into evidence and I want to run through a list of these exhibits with you and ask you whether you sold these items from your bookstore?" Giese was then queried about the series of the books and pamphlets that the Government had introduced into evidence. These included "The Underground Bombing Manual," "Firearms and Self-Defense," "Department of Army Manual, Electronic Blasting Equipment," "Technical Training and Tips: Mine Warfare," "Revolution," "Communist Guerilla Warfare in the U.S.A.," "The Paper Trip," "The Anarchist's Cookbook," "Protect Yourself from Investigation." In each instance Giese denied that the book was carried or sold in his bookstore. During this line of interrogation, he denied that the bookstore carried or sold "Revolution." [2]

Thereafter Giese's lawyer asked him whether he had brought "a representative sample of the types of books that [he did] carry in the bookstore." In response, Giese identified 18 books. He said that he hadn't "necessarily read all of these books." The 18 books included the following: Cleaver, "Soul on Ice;" Horn, "Away with All Pests;" "An English Surgeon in Peoples' China 1954–1969;" Jallee, "Pillage of The Third World;" Frank, "Capitalism and Un-derdevelopment in Latin America;" Jackson, "Soledad Brother;" Neihardt, "Black Elk Speaks;" Greene, "Vietnam;" Engels, "Dialectics of Nature;" Giese, "French Lyric Poetry;" Morgan, "Sisterhood is Powerful;" Club of Rome, "Limits to Growth;" together with a series of anthologies on political and economic topics.

Giese next described his initial meeting with Meyer, with whom he had become acquainted when Meyer wrote to him asking for some books. He related his invitation by Father Stipe to undertake volunteer work in the institute. Thereafter, he gave a narrative account of his participation in discussion groups within the prison facility. He expressly denied that he had ever preached revolution, bombing or the use of violence in any of those meetings. Thereafter, he described the ways in which he became acquainted with the other alleged co-conspirators, and he expressly denied any connection with the alleged conspiracies or the substantive offenses.

On cross-examination, the prosecutor questioned Giese at length about his bookstore and about his association with the various persons who were the alleged members of the conspiracy. The prosecutor then commenced his examination of Giese about "Revolution." After identifying the book, the following exchanges occurred:

"Q. And have you read the book?

A. I have read snatches of it.

Q. [Y]ou heard Mr. Ranels' testimony that some nine of your fingerprints appeared on various pages of this particular book?

A. Yes.

Q. Did you ever give this book or one like it to . . . either of the people on trial or Mr. Cronin, Wallace or Akers, Leslie McKeel, Max Severin, Robert McSherry, Lynn Bruce Meyer?

A. I don't believe so.

**2.** The entire text of that portion of the interrogation is as follows: "Question: Did you ever carry or sell in the bookstore 'From The Movement Toward Revolution?' Answer: I believe not. Question: Did you ever own a copy of that book yourself? Answer: I did. Question:

Do you still own a copy of that book? Answer: I believe so. Question: Where did you purchase your copy of that book? Answer: I think it was J. K. Gill is the biggest book seller in Portland, Oregon. It's commercial."

Q. Now, would you turn . . . to . . . the introduction of the book, the Preface?

A. Okay. VIII.

Q. I would like to ask you to read . . . XIII.

. . . . .

Q. Thank you.

A. It's XIII.

Mr. Paulson: Objection. It's hearsay and to my knowledge, he has not been charged with having read books but with acts in this case of—

The Court: Overruled.

Q. Directing your attention, Mr. Giese, . . . to XIII. Can you read for us that paragraph 'We are all involved in the early stages'—do you see that?

. . . . .

Q. Could you read that particular paragraph for us and continue on?

A. 'We are sorry to'—

Mr. Turner: Mr. Giese, there is an objection.

The Court: Wait a minute.

Mr. Paulson: May I have an objection?

The Court: You may have a continuing objection. Please proceed.

A. You want me to read it aloud? 'We are sorry to hear that the townhouse forever destroyed your belief that army struggle is the only real struggle. That places us in a unique position because, as Che stated, "armed struggle is the only solution for people who fight to free themselves" and we have lost dearly-loved comrades.'

Do you want me to go on?

Q. Yes, sir.

A. 'Also probably every experienced revolutionary has, but we realize that risks must be taken, some will die, others will replace them or us.'

Q. Will you continue to the end of the paragraph.

A. I am trying to make sense out of that sentence. All right. 'Others will replace them or us like people rapping about ending racism, colonialism, sexism and all of the other pigisms, exploitation and all that but these things can only be ended by revolution and revolution is in the final analysis armed struggle, revolution is violence, revolution is war, revolution is bloodshed. How long have different successful national liberation fronts fought before they have won large popular support.' "

In the prosecutor's argument to the jury, he took each of the books, upon which one or more of the alleged co-conspirators' fingerprints had been found, and asked the jury to infer that the defendants whose fingerprints appeared on the books had become members of the conspiracy and had participated in the substantive charges because they were acting out the ideas that they had read in the books.

The prosecutor began by references to "The Blaster's Handbook." He said to the jury:

"Regarding Mr. Cronin, we have the famous Blaster's Handbook that you have heard so much about. This is the how-to-do it in explosives and if you ladies and gentlemen have an opportunity to look at this while you are deliberating, that tells you anything and everything you want to know and probably don't want to know about explosives.

"The fingerprints that are on this book . . . were Leslie McKeel's, Chester Vincent Wallace, Jim Akers, and Jim Cronin. Not Bob McSherry, by the way. Those four people. . . .

". . . On page 104, which shows a picture of blasting caps, are the prints of Jim Akers and Jim Cronin. Now, is that an unusual circumstance, is that just a coincidence that those two fingerprints . . . would be on the same page, which page would deal with blasting caps, which were used in all of the bombings.

. . . . .

"How about page 467. This deals with the destruction of structural steel, railroad ties, buildings, bridges; coincidentally that his fingerprints are on those? . . Now, you don't get a fingerprint in that

position unless you are reading that book. You don't get your fingerprints up there, leafing through it, in that position. The only way you do that is to read it."

A similar line of argument was used in connection with other defendants in respect of the "Special Forces Handbook," "The Anarchist's Handbook," and the "Firearm and Defense Manual."

The prosecutor then directed the jury's attention to "Revolution." He told the jury:

"In California as regards Mr. Giese, we have *From the Movement Toward Revolution*, Mr. Giese has fingerprints on this particular book. He told you that he had one of these books himself, possibly, at home. He could not recall how or if at all his fingerprints got on this particular book which came out of the Debra Sue Apartments in California.

"This is an architectural manual, basically, of urban warfare. Between this book and this book, you have the makings for any sort of urban warfare that you would like to participate in.

"This is basically a conspiracy action, and I would like to just very briefly take excerpts from pages which contain Mr. Giese's fingerprints. 'A revolutionist sees death as a national phenomenon, must be ready to kill to change conditions. Revolution is armed struggle, violence, war, bloodshed and the duty of a revolutionary is to make revolution.

" 'Let's all try to pick targets with more care and planning. The object is to destroy the economy like bombing sites which will affect the economy the most, rip off weapons and money, sniping attacks. Remember, in a revolution, one wins or dies. The stakes are very high.

" 'Do you recall the old words, "Ask what you can do for your country," destroy it, mentally, morally, psychologically and physically destroy it. And whatever you do do it good.'

"Now those are just two pages from this book but these are two pages which contain the fingerprints of Frank Giese. If you have an opportunity, you may want to leaf through the rest of the book, because, as I indicated, this tells you— this is another how to do it for urban warfare." (R.T. 2050–51.)

" . . .

"Did we make up Frank Giese's fingerprints on the book From the Movement Toward Revolution? . . . You read those pages where Frank Giese's fingerprints were. You read those pages. It talks about bombing, sniper attacks. You read that book. You read other pages throughout there. Look at Page 51, for instance, look at the preface. Throughout that book are references to the very thing that these people did." (R.T. 2172.)

## II

No waiver of any objections to the introduction of the contents of "Revolution" can be found from the proceedings during the Government's case-in-chief. As Judge Trask acknowledges, the book and the fingerprint chart were purportedly offered only for the purpose of proving association by fingerprints. Giese's lawyer promptly objected on grounds of relevance and lack of proper foundation. The objections should have been sustained, and if the correct ruling had been made, our problems with "Revolution" would have been over.[3]

The fingerprint evidence did not prove that the persons whose prints appeared had been associated with each other. The evi-

---

**3.** The erroneous admission of the fingerprint evidence, standing alone, would have been harmless error. There was abundant evidence that Giese was well acquainted with McKeel, Wallace, and Severin, and that he associated with them on a number of occasions. The Government was fully aware that there was no controverted issue of fact about Giese's association with these men. The introduction of the fingerprint evidence, of course, did not lay any foundation for the admission of the contents of the book upon which the fingerprints were found for any purpose. The admission of the fingerprint evidence became prejudicial only after the prosecutor used the fingerprint evidence to justify the admission of the contents of the book.

dence only proved that the persons who handled the book had been associated with the book. No inference arises that the persons who handled the book were even casually acquainted in absence of proof that the fingerprints were made at or about the same time. The evidence was to the contrary. The Government's fingerprint expert testified that he could not ascertain when the prints were made. He said that latent prints had been recovered that were seven years old. Thus, the prints on "Revolution" could have been made at any time after the book was published in 1971. There was no evidence from which an inference could arise that the persons whose prints appeared handled the book in the company of one another. The proof of book association was not relevant to any issue in the case.

### III

The first time that the prosecutor made any reference to the contents of "Revolution" was in his cross-examination of Giese. As the quotations from the record reveal, the prosecutor asked Giese to read passages from the book. Giese's lawyer promptly objected. Before his objection was complete, the district court interrupted with an adverse ruling. When he attempted to renew the objection, the district court granted him a continuing objection to the use of the contents of the book. Although the objection was incomplete, the objection together with the prior objection to the fingerprint evidence was more than adequate to preserve the claim of error for appeal.

The majority's view that the error in the admission of the evidence vanished is based on Judge Trask's novel theory of admissibility: Although the Government did not purport to justify the admission of the book on the grounds of impeachment, any error in the admission of the book was harmless because the contents of the book were admissible to impeach his character evidence and to impeach his veracity as a witness. Judge Trask's rationale is contradicted by the record and forbidden by the First Amendment of the Constitution.

The majority cannot escape the prosecutor's argument to the jury based upon the contents of the book "Revolution." The prosecutor used the contents of this book in the same way in which he used the contents of books describing the manufacture of explosives and explosive devices: namely, to convince the jury that it should attribute the ideas in the book to the defendants, who thereafter acted upon them to form the conspiracy and to engage in the substantive offenses. This was the very purpose that the prosecutor had announced in his opening statement. The prosecutor had been unable to produce any evidence of any kind that linked Giese with these so-called do-it-yourself manuals. He therefore concentrated his attention on "Revolution," which Giese admitted that he had read. The Government has never argued that the book was admissible for impeachment purposes. Rather, its argument before us, consistent with its argument in the trial court, was that "Revolution" was admissible to prove that Giese adopted the ideas of the book and, acting on those ideas, joined a conspiracy to bomb recruiting centers.

The contents of the book could not have been used to impeach Giese, even if the Government had made that attempt. The contents of the books that a person reads cannot be used as evidence of his peaceable or non-peaceable character. No inference of any kind can be drawn about a person's character from the kinds of books that he reads. We have no basis in human experience to assume that persons of "good" character confine their reading matter to "good" books, or that persons who read peaceful books are peaceful people, or that persons who read books involving violence are violent people.

The second prong of Judge Trask's impeachment rationale is that proof that Giese read "Revolution" contradicted his testimony about the kinds of books he read. The contents of the book were admissible to impeach Giese's veracity by showing "the sharp contrast between the kinds of books Giese said he read and the kinds he actually read." (Judge Trask's Opinion, n.30.)

Giese never testified about the kind of books he read. Giese's sole reference to his reading habits was a passing reference to the fact that he read some foreign magazines and newspapers, the contents of which were not in evidence. Thus, there was no evidence on this score to contradict.

Giese did introduce 18 books and pamphlets that he described as representative samples of the literature he carried in his bookstore. He testified that "Revolution" was never carried in his bookstore. The Government introduced no evidence to show that, contrary to his testimony, the books that he introduced were not representative samples of the books he carried in his bookstore. It offered no evidence that the book "Revolution" was carried in his bookstore.[4]

If the contents of "Revolution" had been properly admitted into evidence, Giese could not have successfully claimed error in being forced to read from the book. It would rest entirely within the district court's discretion whether compelled book reading was appropriate. However, the contents of the book were not admissible for any purpose in this case and the compulsory reading from the book made the error even more egregious. The prosecutor's transparent purpose in requiring Giese to read the inflammatory passages of the book was to convey to the jury that the words of the author were the words of Giese. The prosecutor fully exploited that strategy in his argument to the jury.

Judge Trask says that "Even if the act of reading did hurt Giese's cause to some extent, the probative value of enabling the jury to observe his demeanor while he was being impeached outweighed the prejudicial effect. The 'requested performance' was clearly relevant to an important issue in the case: Giese's credibility. It is axiomatic that jurors are entitled to see how the witness reacts when the cross-examiner captures him in a contradiction or exposes one of his falsehoods. '*The demeanor of the witness on the stand* may always be considered by the jury in their estimation of his credibility.' *IIIA Wigmore on Evidence* § 946, p. 783 (Chadbourn Rev.1974) (emphasis in original)." (Judge Trask's Opinion, supra, at 1193.) Professor Wigmore would have been astonished to discover that he supported a view that any inferences whatever could be drawn about a witness' veracity from the manner in which a witness read out loud from a book. Not only does Judge Trask say that a person's character and his veracity can be impeached by the books he reads, but even by the manner in which he reads them.

## IV

Even if Giese had not protected his record by appropriate objections to the fingerprints, the book itself, and the contents of the book, the use of the book as evidence of Giese's complicity in the conspiracy or for impeachment was plain error because that use infringed Dr. Giese's rights protected by the First Amendment. The author's writing of the book and Giese's reading of the book are constitutionally protected. The freedom to write books and to read books, to advocate ideas and to listen to ideas are fundamental constitutional rights that may neither be denied or abridged. Free speech is the " 'matrix, the indispensable condition, of nearly every other form of freedom.' *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288." (*Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094.) "This right to receive information and ideas, regardless of their social worth, *see Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948), is fundamental to our free society." (*Stanley v. Georgia* (1969) 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542.)

4. There was no "sharp contrast" between the kinds of books that Giese introduced as representative of the books that were carried in the bookstore and "Revolution." The book "Revolution" is an anthology, which includes a spectrum of writings ranging from liberal to far left to radical. A number of the books that Giese introduced as samples from his book store represent a similar range of political writings. The sample books, like "Revolution," were commercially published and widely disseminated to bookstores and libraries throughout the United States.

Neither the theory of relevance that the Government argued nor that proposed by my Brother Trask can withstand First Amendment scrutiny. The Government's theory, which it argued to the jury, was that the ideas of an author of a book may properly be attributed to the reader of the book and then used against him to prove disposition to commit a crime, motive to undertake criminal action, or proof that he did the acts charged. None of these uses is constitutionally permissible. Freedom of speech would be totally destroyed if the shadow of the prosecutor fell across the pages of the books we read. Even during the evil thralldom of McCarthyism, we did not embrace the concept of guilt by book association.

To be sure, as Mr. Justice Holmes observed: "Every idea is an incitement. It offers itself for belief and if believed, is is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason. . . . If in the long run the beliefs expressed in proletarian dictatorship are designed to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way." (Mr. Justice Holmes, with whom Mr. Justice Brandeis concurred, dissenting in *Gitlow v. New York* (1925) 268 U.S. 652, 672, 673, 45 S.Ct. 625, 632, 69 L.Ed. 1138.)[5]

The admission and use of "Revolution" is no more constitutionally acceptable if it had been used for impeachment. No inferences can constitutionally be drawn about the character of book readers on the basis of the books they read. Abstract advocacy of violence is constitutionally protected. (*Brandenburg v. Ohio* (1969) 395 U.S. 444, 447–48, 89 S.Ct. 1827, 23 L.Ed.2d 430.) The corollary of the right to utter or to print advocacy of violence is the right to listen or to read violent exhortations. The use of book reading, including the reading of violent books, to impeach a person's character is utterly incompatible with constitutional protections afforded free speech.[6]

## V

The majority opinion is in conflict with *United States v. McCrea* (9th Cir. 1978) 583 F.2d 1083. In *McCrea,* the defendant was convicted for possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d). One of his contentions on appeal was that the court erred in admitting into evidence two books entitled "Improvised Munitions Handbook" and "OSS Sabotage & Demolition Manual." The court held that the evidence was improperly admitted because the "titles alone would have the tendency to prejudice the defendant." (583 F.2d at 1086.) We held that the error was harmless, however, because the evidence

---

**5.** In quoting Mr. Justice Holmes, I do not mean to imply that the clumsy prose in "Revolution" is eloquent or that it would kindle anyone's reason. The incitement, which the prosecutor intended to engender, was the prejudice of the jury against Giese to whom the prosecutor attributed the inflammatory rhetoric.

**6.** As Mr. Justice Harlan reminds us in *Cohen v. California* (1971) 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284: "The constitutional right of free expression is powerful medicine in a society as diverse and populace as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that the use of such freedom will ultimately produce a more capable citizenry and a more perfect polity and in the belief that no other approach would comport with the promise of individual dignity and choice upon which our political system rests. [citation omitted]

"To many, the immediate consequence of this freedom may often appear to be only verbal tulmult, discord, and even offensive utterance. . . . That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. . . . That is why '[w]holly neutral futilities * * * come under the protection of free speech as fully as do Keats' poems or Donne's sermons,' . . . ., and why 'so long as the means are peaceful, the communication need not meet standards of acceptability,' [citations omitted]."

against McCrea was overwhelming and the prosecutor "made no mention of those books in his opening statement to the jury, nor did he attempt to capitalize on them during the trial itself." McCrea did not contend that the prosecutor "referred to the inflammatory literature in any way during any portion of the proceedings," and, therefore, the panel did not need to augment the record to include the closing statements of counsel. (583 F.2d at 1086 n.3.)

There are distinctions between *McCrea* and *Giese,* but those distinctions reinforce the prejudicial nature of the error in Giese's case. In both cases, the Government used books for the purpose of showing motive or disposition to commit the crimes charged. Unlike McCrea, the case against Giese was tenuous, the prosecutor emphasized "Revolution" during his interrogation of Giese, and he thoroughly capitalized on the contents of the book during his summation to the jury.

## VI

The district court erred in admitting testimony about Giese's participation in political discussions and his recommendation of certain books. This evidence was admitted, over objection, during the Government's case-in-chief. The intended impact of this testimony was to place before the jury Giese's unpopular political views and his interest in unpopular literature expressing those views. The testimony had no relevance to any issue in the case. Giese had not been indicted for his politics or for his literary tastes, and he should not have been put on trial for either.

Judge Trask says that Meyer's testimony was relevant "because it provided the jury with information about his relationship with many of the people who subsequently became his co-conspirators. Like the fingerprints on '*From The Movement Toward Revolution,*' Myere's testimony shed light on the conspirators' association with each other. It also tended to show that Giese exercised a leadership role vis-a-vis the other conspirators. By conducting discussions on a topic of mutual interest—radical politics—and by furnishing or recommending books on that subject, Giese attracted Meyer (and perhaps his fellow-prisoners Severin and Wallace) to the group at the bookstore which eventually formed the conspiracy." (Judge Trask's Opinion, *supra,* at 1194–1195.)

I cannot understand how Giese's statement to the prisoners had anything to do with proof that Giese was acquainted with Meyer or any of the other alleged co-conspirators. The unarticulated premise of Judge Trask's discussion appears to be that persons who discuss radical politics are predisposed to form conspiracies. That inference is constitutionally impermissible. (*E. g., Brandenburg v. Ohio, supra,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430; *Noto v. United States* (1961) 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836.)

## VII

Prosecutorial misconduct in argument was extensive in this case. The prosecutor vouched for the Government's witnesses, commented on Giese's failure to produce certain evidence, injected his personal belief in Giese's guilt, suggested that a co-defendant's confession, inadmissible as to Giese, corroborated other evidence against Giese. Although defense counsel did not properly protect the record by appropriate objections or motions, the errors were sufficiently pernicious to fall within the purview of the plain error doctrine.[7]

---

**7.** Rule 52(b), Fed.Rules Crim.Proc.; *United States v. Cornfeld* (9th Cir. 1977) 563 F.2d 967, 970; *United States v. Preciado-Gomez* (9th Cir. 1976) 529 F.2d 935, 942; *United States v. Perez* (9th Cir. 1974) 491 F.2d 167, 173 & n.10; *United States v. Memoli* (9th Cir. 1971) 449 F.2d 160. The critical inquiry is whether in the circumstances of the trial as a whole the remarks were so prejudicial as to make it likely that they influenced the jury adversely to the defendant, depriving him of a fair trial. *See, e. g., Lawn v. United States* (1957) 355 U.S. 339, 359–60 n.15, 78 S.Ct. 311, 2 L.Ed.2d 321; *United States v. Socony-Vacuum Oil Co., Inc.* (1940) 310 U.S. 150, 237–43, 60 S.Ct. 811, 84 L.Ed. 1129; *Berger v. United States* (1935) 295 U.S. 78, 84–89, 55 S.Ct. 629, 79 L.Ed. 1314; *United States v. Greenbank* (9th Cir. 1974) 491 F.2d 184, 188–89.

To counter attacks upon the credibility of McSherry and Meyer, the prosecutor attempted to cloak those witnesses with the credibility attached to the Government.[8] For instance, the prosecutor told the jury, ". . . Now, there is one other way that they [McSherry and Meyer] could have both said the same things, as they did, and that would be if the Government manufactured the evidence or if the Government put them on and perjured themselves. That is another fact you ladies and gentlemen must consider.

"Did the Government do that? Do you believe that people who have presented this case to you for the last two weeks, would manufacture or present evidence which was perjured? . . ."

In rebuttal, the prosecutor commented at length on the evidence, and added:

". . . Now, the reason for the attacks upon the Government is an old ploy and the ploy is, when you are faced with a strong case, you attack the Government; you attack the U. S. Attorney's office; you attack the FBI; you attack the Government's witnesses; you attack its motives but you never let the jury try the case against the defendants. . . . And that is precisely what happened in the course of this trial.

"Now, I appreciate Mr. Bay's statement that if there is any fabrication, falsehood, perjury and bribery in this case, it rests at the Government's counsel table because we failed to face that face-on. And it's true, if such a thing occurred, the blame falls on the people at the counsel table and the person standing before you right now.

"We are charged, as I mentioned before, with the responsibility for this case and to handle it and all related cases. From its inception I have handled them— let's not misunderstand, while I might not be the world's best attorney and while I don't know my Roman numerals . . . I certainly know the facts in this case, . . . . .

"Members of the jury, you are going to have to decide, after having observed us for two weeks, whether or not we would be willing to bribe a witness and to be a party to perjury by Mrs. Rosen, McSherry and Meyer.

"Let's consider this, if we were really out to fix the case, don't you think we could have done it up better? . . . [He restated the motives of McSherry to tell the truth and the corroborative evidence, asking as to each, "Did we make it up?"]."

The prosecutor repeatedly commented upon Giese's failure to produce evidence.[9] For example, defense counsel had suggested that Meyer was not credible because he was emotionally unstable, had had mental breakdowns, and had a long criminal record. The prosecutor said, "The defense did not present one psychiatrist nor one psychologist, however, who sat before you and said Lynn Bruce Meyer is suffering from this mental illness and . . . cannot tell the truth, nor . . . can he remember what occurred."

Meyer had written many letters to Mrs. Rosen during his incarceration before trial and evidence was introduced to show that almost all of the letters had been destroyed

---

8. There are two pitfalls involved in the prosecution's vouching for its witnesses: the first is the interjection of the Government's credibility as a fact in the case; the second is the suggestion that the Government has information which was not introduced at the trial which leads it to believe that its witnesses are credible, *e. g., Lawn v. United States, supra*, 355 U.S. at 359–60, n.15, 78 S.Ct. 311. Where as here, the case against the defendant turns on whether government or defense witnesses are believed, extended buttressing of the Government's witnesses requires reversal as plain error. *See United States v. Ludwig* (10th Cir. 1974) 508 F.2d 140, 142–43; *Hall v. United States* (5th Cir. 1969) 419 F.2d 582, 587–88; *Gradsky v. United States* (5th Cir. 1967) 373 F.2d 706, 709–10.

9. *See Wagner v. United States* (5th Cir. 1959) 263 F.2d 877, 883–84 (holding similar prosecutorial remarks to be plain error).

at Meyer's request. Defense counsel had tried to imply that the letters were a vehicle for rigging testimony and that they were destroyed in an attempt to conceal exculpatory matter from the defense. Mrs. Rosen admitted that she had two letters with her written by Meyer. The defense asked to see the letters and have them marked as exhibits. The defense did not offer them into evidence. The prosecutor argued: "Were they ever introduced? Were they ever introduced? They had two letters written by Meyer to Mrs. Rosen during the time in question. Now, why weren't they introduced? Was it because there was information in the letters which was favorable to Meyer or prejudicial to the defendants or perhaps both? You can speculate on that. It's another red herring to divert your attention . . . ." Giese's objection to the invitation to speculate was overruled.

The prosecutor repeatedly referred to Giese's ownership of a .38 revolver, allegedly used during the Foster Road bombing, and asked the jury to conjecture about Giese's reasons for not producing the gun at trial.

The prosecutor's most serious error in this connection was his rhetorical question to the jury asking why, if Giese were innocent, he had not produced Severin to testify for him. (" . . . Max Severin was there but did he [Giese] call Max Severin? He did not call Max Severin because this man has something to hide. He has something to hide otherwise he would have called the

person who could have conclusively known, in fact, he was not present at such conversation, and he did not make an admission to the Ira Keller affair.") No excuse can be found for the prosecutor's reference to Giese's failure to call Severin as a witness. The prosecutor not only knew that Giese had no obligation to call anyone, but he also knew that Severin was an unindicted co-conspirator and that Giese could not have compelled Severin's testimony in the face of Severin's Fifth Amendment privilege with respect to the very conspiracy for which Giese was on trial.[10]

The prosecutor also said that Giese was a wolf in sheep's clothing and that, underneath his sophisticated exterior, he "is a very dangerous individual." He also said, "I certainly know the facts in this case," and added that he was "sure" that the reference to "Giese's Volks" and McSherry's plan for the bank robbery was to Giese's own vehicle, and not the one that he had given to McSherry's wife.[11]

The prosecutor rounded out his errors by referring to a confession which was not admitted as to Giese. The confession, introduced only as to Wallace, contained admissions that he had monitored police radio transmissions about the bombings. McSherry and Meyer also testified that this had been Wallace's role. In his efforts to bolster the credibility of his witnesses, the prosecutor said, "For instance, on the issue of corroboration, one of the more significant pieces of corroboration in this case is

**10.** This is clearly not a case of an isolated allusion to a failure to produce evidence as in *United States v. Tierney* (9th Cir. 1970) 424 F.2d 643, 646, and *Forsberg v. United States* (9th Cir. 1965) 351 F.2d 242, 249.

**11.** Interjection of the prosecutor's own belief in the guilt of a defendant is grounds for reversal. *See United States v. Schartner* (3d Cir. 1970) 426 F.2d 470, 478 (reversible error in the remark " 'I say to you with all the sincerity I can muster that if you do not convict the defendant, the guilty will escape'."); *Hall v. United States, supra,* 419 F.2d 585–86 (remark was "we try to prosecute only the guilty." The *Hall* court also

held that the court should have intervened when the prosecutor called the defendant a "hoodlum"). *See also Steele v. United States* (5th Cir. 1955) 222 F.2d 628, in which the Fifth Circuit reversed on other grounds but stated that where the prosecutor stated he personally believed the defendant to be guilty and characterized him as a "Dr. Jekyll and Mr. Hyde" it was so prejudicial that even in the absence of objection, the district judge should have stepped in to admonish the prosecutor and instruct the jury to disregard the remarks. *Id.* at 631.

the two Wallace confessions. Okay, Meyer and McSherry, if they are lying, why do we have the two Wallace confessions?"

I fully agree that prosecutorial blunders in arguing a difficult case before a jury are not always grounds for reversal. Each case must be examined in its own context to ascertain the impact of prosecutorial indiscretions in the particular case.[12] In this case, we do not have simply a brief prosecutorial lapse, but a whole series of instances of misconduct.[13]

## VIII

Although I do not agree with all of the reasoning in the majority's discussion of the remaining points in the case, I agree with the majority's conclusion that the other claimed errors are either non-existent or harmless.

Prejudicial errors in the admission of evidence, of constitutional and non-constitutional dimension, together with prosecutorial misconduct in argument to the jury deprived Giese of a fair trial and his conviction should be reversed.

ELY, Circuit Judge:

The panel originally concerned with the present appeal consisted of Judges Hufstedler and Trask of this Court and District Judge Sweigert, sitting by designation. Judges Trask and Sweigert issued the majority Opinion, with Judge Hufstedler dissenting.

A judge of our Court in active service requested our full Court to sit, *en banc*, and

review the appeal. I voted that this be done, tentatively believing that the original majority Opinion constituted an impediment to the intellectual growth of our citizenry. The majority of my colleagues voted to the contrary, and the cause has now been returned to the original panel. This being true, I have concluded that I am no longer a judge who is charged directly with any further responsibility in connection with the appeal. Accordingly, I have decided, with some reluctance, that considerations of policy, particularly the deference that should be accorded to panel autonomy, should restrain me from setting forth at length the views that I tentatively hold. I exercise that self-restraint.

---

12. *E. g., Patriarca v. United States* (1st Cir. 1968) 402 F.2 314, 318–22 & nn.6–7.

13. *Compare, e. g., United States v. Greenbank, supra,* 491 F.2d at 188–89; *United States v. Salcedo* (9th Cir. 1971) 452 F.2d 1201; *United States v. Zumpano* (9th Cir. 1970) 436 F.2d 535, 539; *United States v. Tierney, supra,* 424 F.2d at 646; *Forsberg v. United States, supra,* 351 F.2d 242 (no reversal where defense counsel failed to object to isolated prejudicial remark in the prosecutor's closing statement) *with Berger v. United States, supra,* 295 U.S. at 84–89, 55 S.Ct. 629; *United States v. Ludwig, supra,* 508 F.2d at 142–43; *United States v. Fernandez* (5th Cir. 1974) 496 F.2d 1294, 1299–1303; *United States v. Cummings* (9th Cir. 1972) 468 F.2d 274, 277–78; *Hall v. United States, supra,* 419 F.2d at 585–87; *Gradsky v. United States, supra,* 373 F.2d at 709–10; *Wagner v. United States, supra,* 263 F.2d at 883–84 (reversing where cumulative effect of error may have affected outcome of the trial).